**STATE of Minnesota, Respondent,**

v.

**John THOMPSON a/k/a Baron Lee Johnson, Appellant.**

**No. C9–95–1135.**

Supreme Court of Minnesota.

Feb. 16, 1996.

Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Darrell C. Hill, Asst. Ramsey Co. Atty., St. Paul, for respondent.

## OPINION

TOMLJANOVICH, Justice.

On January 25, 1994, appellant John Thompson, a/k/a Baron Lee Johnson (Johnson) was indicted by a Ramsey County Grand Jury for violation of Minn.Stat. § 609.185(3) (1994), first-degree murder; Minn.Stat. § 609.10(1) (1994), second-degree murder; and Minn.Stat. § 609.245, subd. 1 (1994), aggravated robbery. After entering pleas of not guilty, the matter was called for trial in Ramsey County District Court on February 23, 1995. Johnson waived a jury

trial and testimony was taken February 23–27, 1995. On February 27, 1995, the district court judge found Johnson guilty of first-degree murder and aggravated robbery. On March 21, 1995, Johnson was sentenced to the Commissioner of Corrections for an executed life term. In addition, he received a consecutive executed term of 48 months on the aggravated robbery conviction.

On the morning of November 23, 1994, St. Paul Police learned that the body of a man, later identified as John Thole, had been found in a car parked on West Central Avenue near Chatsworth Street in St. Paul. He had been shot once in the head. The same morning, just before 9 a.m., Raymond Deshler came to St. Paul Police headquarters and told police that he had been with Thole between 1 a.m. and 2 a.m. the prior night when Thole had been shot. Police learned that Lucille Dodd and Johnson had also been present, and that Johnson had shot Thole. Johnson was arrested on December 4, 1994. The following account emerged as to what happened.

Thole and Deshler worked for Twin Cities Janitorial Supply. After getting off work around 5 p.m. on November 22, 1994, they and a third person drove to a body shop in Maplewood where Thole was having work done on his Thunderbird. Because additional work needed to be done, the three men went to the Keller Lake Lounge where they had dinner and drinks.

After a couple of hours, they returned to the body shop to pick up Thole's car. The third person in their party went home, but Deshler and Thole returned to the bar where they continued to drink, ultimately consuming 12 to 14 drinks.

Eventually, the two men determined that they wished to engage the services of a prostitute. They took Thole's car and drove to his apartment on the east side of St. Paul to get some money. While at Thole's apartment, they each had a couple beers and Thole showed Deshler a handgun he had broken down on a dresser in his bedroom. When they left the apartment, Thole had apparently reassembled the gun and placed it under his coat. Deshler claimed he was unaware of this.

Although their original intent was to go to Lee LeNore's Sauna on Snelling Avenue, the two men ended up outside the Badger Bar located on Grotto and University. Apparently due to its notoriety for drug sales and prostitution, surveillance cameras have been installed outside of the Badger Bar.

Lucille Dodd was standing in the street outside the bar and went over to speak to the two men as they drove up. Either Thole or Deshler asked Dodd where they might obtain some cocaine. Dodd then attracted the attention of Johnson to ask if he had any drugs for sale. Johnson indicated that he did. Both he and Dodd got into the back of the Thunderbird with Johnson behind Deshler, who was driving, and Dodd behind Thole. They then drove away from the area to avoid being videotaped by the surveillance cameras.

At this point, the accounts of Deshler, Dodd and Johnson diverge somewhat as to what occurred. However, Johnson's own account was that after he got into the car, he wanted to quickly conclude the drug transaction. He kept asking Thole what drugs he wanted, but Thole kept saying only that he had money to spend. Thole was also fidgeting with his jacket and Johnson became concerned that something other than a drug transaction might occur. To make sure he was not at a disadvantage, he drew a handgun and pointed it at Thole's head demanding to know what was going on. Thole then said, "I wouldn't do that if I were you," and Johnson heard a click. Johnson then looked down and saw that Thole was pointing a gun at him between the front bucket seats of the car and, while looking at Thole's gun, Johnson fired his weapon. Johnson then testified that he looked up, saw Thole was hit, and noticed that Deshler now had Thole's gun. Johnson pointed his gun at Deshler and told Deshler to drop Thole's gun. Deshler then threw Thole's gun into the back seat. The gun landed in Dodd's lap and Dodd "put it under her coat or stuck it in her pocket or something." Johnson then told Deshler to get out of the car. Deshler complied. Though Johnson denied that he had made any demands for money from Thole or Desh-

ler, both Dodd and Deshler testified that when Johnson first pulled his gun, he told both Thole and Deshler to give him all their money.

Johnson testified that he then went to his girlfriend's home where he hid both weapons under a mattress. At a later point, he sold Thole's gun to a relative and he claimed his own gun was stolen. However, he acknowledged that he told Dodd he had thrown the gun into a river.

When Johnson was arrested on December 4, 1944, he initially refused to speak with police, but later agreed to give them a statement. The trial court found Johnson guilty of first-degree murder of Thole and aggravated robbery of Deshler.

■ Johnson argues that the evidence in the case was insufficient to convict him of first-degree murder under Minn.Stat. § 609.185(3) (1994). Specifically, he claims that the evidence "was insufficient to support a finding that he acted with intent to kill so that his conviction should be reduced to second-degree felony murder in violation of Minn.Stat. § 609.19(2)."

■ In a sufficiency of the evidence challenge,

> "[i]f the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, the court will not disturb its verdict." The court will examine the evidence by viewing it in the light most favorable to the verdict * * *.

*State v. Daniels,* 361 N.W.2d 819, 826 (Minn. 1985) (citations omitted) (citing *State v. McCullum,* 289 N.W.2d 89, 91 (Minn.1979)). The findings of a trial court, after waiver of a jury trial, are entitled the same weight as a jury verdict. *State. v. Bouwman,* 354 N.W.2d 1, 4 (Minn.1984).

■ Minn.Stat. § 609.185(3) provides:

Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life: * * * (3) causes the death of a human being with intent to effect the death of the person or

another, while committing or attempting to commit burglary, aggravated robbery, * * * or any felony violation of chapter 152 involving the unlawful sale of a controlled substance * * *.

Under Minn.Stat. § 609.02, subd. 9(4), the phrase " 'with intent to' * * * means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Further, because intent is a state of mind, it is generally proved by inferences drawn from a person's words or actions in light of all the surrounding circumstances. *State v. Andrews,* 388 N.W.2d 723, 728 (Minn.1986).

Johnson claims that though he was pointing his pistol directly at Thole's head, pulling the trigger was a "reflexive action after appellant became aware that Thole was pulling out his own handgun." Thus, that the bullet struck Thole in the head was "happenstance." However, in similar cases, where the defendant claims that the shooting was reflexive or unintentional, this court has allowed a finding of intent to stand.

In *State v. Campbell,* 281 Minn. 1, 161 N.W.2d 47 (1968), the victim was shot in the head at close range after he threw a boning knife at the defendant who was pointing a gun at him. Though the defendant claimed the weapon's discharge was caused by involuntary reflex to the knife hitting him, the court did not overturn a jury finding of intent. This court stated: "Where, as here, defendant prepared himself for robbery by taking a gun which he has first examined to make certain that it contains live ammunition, * * * the inference of * * * intent to shoot and kill is not only permissible, but virtually inescapable." *Id.,* 161 N.W.2d at 55. In the present case, Johnson carried with him a loaded handgun—a fact which, under *Campbell,* allows a finding of intent. Further, in *State v. Boitnott,* 443 N.W.2d 527 (Minn.1989), while the defendant and the victim, who had a gun, were struggling, the defendant had a pistol pointed at the victim's head. Though the defendant claimed that he fired his weapon without meaning to, this court allowed a jury finding of intent to stand. *Id.* at 531.

■ In the present case, as in both *Boitnott* and *Campbell,* the defendant had a loaded weapon pointed at the victim's head. If acts of aggression such as those in *Boitnott* and *Campbell* were not enough to overcome a finding of intent, then neither is the victim's pointing a gun at the defendant. Next, Johnson argues that the fact that there were no multiple shots should "contradict any inference of intent to kill." We disagree. Johnson cites *State v. Swain,* 269 N.W.2d 707 (Minn.1978) to support his contention. Though in *Swain,* multiple blows to the victim's head by the defendant did not lead to a finding of premeditation, this court cited two cases, *State v. Hare,* 278 Minn. 405, 154 N.W.2d 820 (1967), and *State v. Martin,* 261 N.W.2d 341 (Minn.1977), in which multiple blows did support such a finding. However, even if multiple blows do imply premeditation, that syllogism does not logically lead to the conclusion that a single blow implies the absence of intent. Further, as pointed out by the state, this court has allowed intent to kill to be shown by a single gunshot fired at close range. *See, e.g., State v. Robinson,* 536 N.W.2d 1, 2 (Minn.1995); *Boitnott,* 443 N.W.2d at 531.

■ Finally, Johnson argues that allowing Deshler to walk away from the scene after the shooting contradicts a finding of intent. While it is true that a defendant's conduct after the killing can be relevant to his or her intent, *Andrews,* 388 N.W.2d at 728, Johnson does not explain how allowing Deshler to walk away sheds any light on the presence or absence of intent to kill Thole. Further, evidence of callousness following the incident has been held to be consistent with a finding of intent. *See, e.g., State v. Plan,* 316 N.W.2d 727, 728 (Minn.1982). As the state points out, after the incident, rather than seeking medical help or going to the police, Johnson abandoned Thole's car with his body still in it.

In this case, Johnson entered Thole's car with a loaded pistol. He pointed the weapon at Thole's head. The only provocation for the shooting was that Johnson saw Thole also had a handgun pointed at him. Following the shooting, Johnson neither sought medical help for Thole nor contacted police. We therefore find that there was sufficient evidence to support a finding that Johnson acted with the requisite intent to commit first-degree murder under Minn.Stat. § 609.185(3) (1994).

■ Johnson also argues that he is entitled to have his conviction for first-degree murder reduced to manslaughter based on the theory of "imperfect self-defense." Professors LaFave and Scott explain that some cases apply imperfect self-defense to situations in which one, but not all, of the elements of self-defense have been met. 2 LaFave and Scott, *Substantive Criminal Law* § 7.11(a) (1986). Generally, the effect of making out an imperfect self-defense claim is that a first-degree murder charge is reduced to manslaughter. *Id.*

■ Under Minn.Stat. § 609.065 (1994), "[t]he intentional taking of life of another is not authorized * * * except when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death * * *." Additionally, the absence of aggression or provocation on the part of the slayer is necessary before self-defense may be claimed. *State v. Johnson,* 277 Minn. 368, 152 N.W.2d 529, 530 (1967). However, if the original aggressor withdraws from the conflict and such withdrawal is communicated to the intended victim, then the right to use self-defense can be restored to the original aggressor. *Bellcourt v. State,* 390 N.W.2d 269, 272 (Minn.1986).

In the current situation, even Johnson's version of the facts would support the existence of only one element of self-defense. Because Thole had a gun pointed at Johnson, Johnson could reasonably have believed that by shooting Thole, he was preventing an offense which exposed him to great bodily harm. However, Johnson provoked the situation which made self-defense necessary and in no way withdrew from that situation. Thus, Johnson argues that while self-defense may not apply, LaFave and Scott's imperfect self-defense should apply.

■ However, Johnson cites no authority, nor was any found, in which Minnesota has adopted an imperfect self-defense theory.

Indeed, as pointed out by Johnson, in *State v. Buchanan,* 431 N.W.2d 542 (Minn.1988), this court refused to reduce a first-degree murder conviction to manslaughter because one of three elements of a self-defense theory was met. This court stated: "[w]e resist the invitation to fashion a new defense which the legislature has not seen fit to mandate." *Id.* at 549. In the present case, we once again decline to accept the invitation to adopt this new defense.

Because we find that there was sufficient evidence for the trial court to have found that Johnson intentionally killed Thole, and we refuse to recognize the defense of imperfect self-defense, we affirm Johnson's conviction of first-degree murder.

Affirmed.