Justin Brooks STILES, Petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. C6–02–1730.

Supreme Court of Minnesota.

July 3, 2003.

Leslie J. Rosenberg, Asst. State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Donna J. Wolfson, Asst. County Attorney, Minneapolis, MN, for Respondent.

## OPINION

MEYER, Justice.

A jury convicted Justin Brooks Stiles of the first- and second-degree murder of Heinz Moorman. He was sentenced to life in prison. In this appeal Stiles argues that the postconviction court abused its discretion in two regards: first, it denied relief based on the trial court's refusal to instruct the jury on three lesser-included offenses; and second, it denied relief on two evidentiary rulings of the trial court. We affirm the district court.

Appellant Justin Brooks Stiles was nineteen years old when he and four of his friends attempted to rob eighteen-year-old Heinz Moorman of a half pound of marijuana. The young men were habitual marijuana users, and frequently bought drugs from Moorman. On the day of the shooting, however, Stiles and his friends could not pay for the marijuana, so they devised a plan to steal the drugs.

Stiles' friend, Brandon Connor, called Moorman and arranged to meet him in Augsburg Park in Richfield to buy some marijuana. The young men planned to bring guns along to the meeting, which they could use to scare Moorman into turning over the marijuana. On the day of the shooting, Stiles had taken a .12 gauge sawed-off shotgun outside his house and shot it at a tree to see if it was working. Earlier in the week Stiles had sawed off the stock and barrel of the shotgun.

Around 9:00 p.m. on January 8, 1998, the five men—Stiles, Connor, and three other friends, Sean Ueland, Charlie Seepersaud, and Jason Valleen—drove to Augsburg Park in a van, and Moorman drove into the park a short time later. Stiles had the .12 gauge sawed-off shotgun and Seepersaud had a .20 gauge shotgun. Moorman approached the van, but refused Connor's invitation to get in the van. Instead, Moorman invited Connor out of the van and opened the trunk of his car. He took out a shoebox, which he had previously used to transport marijuana for the group. The shoebox contained a half pound of marijuana. Once Moorman took out the shoebox, Stiles and Seepersaud jumped out of the van, cocked their shotguns, and yelled, "give us your shit!"

Instead of turning over the drugs upon seeing the guns, Moorman threw the shoebox back into the trunk of his car, slammed the trunk shut, and reached toward his waist. According to Connor, Ueland yelled to his friends. Ueland saw that Moorman had a gun in his waistband and that Moorman was reaching for a gun. Stiles and Seepersaud fired at Moorman, hitting him several times. Moorman died from multiple gunshot wounds.

After the shooting, Seepersaud ran off, and the other four men got in the van and drove to Connor's house. Stiles threatened the others not to tell anyone what had happened. Nevertheless, Stiles told several other friends that he had shot Moorman after Moorman pulled a gun.

The evening of the shooting, Stacy Stegora picked Stiles up from his house and took him to her home in Big Lake, Minnesota. Stiles asked Stegora to find the guns and hide them. He also told Stegora that he was going to tell police he was someone else. When the police found Stiles at Stegora's home on January 11, 1998, Stiles attempted to conceal his identity. After his arrest, he was charged with two counts of first-degree murder (while committing attempted aggravated robbery and the sale of a controlled substance), and one count of intentional second-degree murder.

The state presented its case against Stiles using testimony from his friends and three of his accomplices, Ueland, Connor, and Seepersaud. One friend testified that while Connor led the planning, Stiles participated in discussions of how the robbery would proceed and agreed to bring his gun to the meeting with Moorman. Seepersaud testified that Stiles carried a .12 gauge shotgun to the park. Ueland testified that Stiles chambered a round as Moorman opened the trunk of his car. All three accomplices testified that Stiles shot three times at Moorman—twice after Moorman had fallen to the ground. To shoot the second and third time, Stiles had to manually pump his shotgun to chamber each additional shell. Ueland testified that immediately after the murder, Stiles threatened to kill Ueland if he told anyone what Stiles had done. The state elicited testimony from Suresh Beni and Stacy Stegora that Stiles told them he killed Moorman.

In addition to presenting testimony from Stiles' friends and accomplices, the state called a ballistics expert from the Bureau of Criminal Apprehension State Crime Laboratory. The expert concluded, based on his analysis of shotgun shell wads and shotcups discovered both at the crime scene and during the autopsy, that three shots were fired from the .12 gauge shotgun, and one from the .20 gauge shotgun. He testified that the pattern of holes found on Moorman's jacket was consistent with shots from the .12 gauge, one at a distance of less than two feet, and the second from between five and ten feet. The state also called the medical examiner, who concurred with the ballistics expert about the number and relative proximity of shots.

The defense theory was that Stiles did not shoot Moorman, but that Connor and others implicated Stiles in order to shift blame from themselves. Stiles presented two defense witnesses who had been jailed with Connor, who testified that Connor had reported that Valleen and Seepersaud were the shooters. A third witness attacked the credibility of Stegora, who had testified that Stiles admitted killing Moorman. Stiles did not testify in his own defense.

Initially, the question of intent played only a minor part in Stiles' defense. While Stiles' defense counsel argued in his opening statement that Ueland and Valleen never intended to harm Moorman, intent became an important subject of testimony when Seepersaud took the stand at the end of trial. Seepersaud explained that he did not intend to kill Moorman, but panicked when he saw the gun in Moorman's waistband. Stiles' defense counsel argued in his closing that no one went to the park intending to kill, but he did admit that the shooters intended to shoot Moorman before Moorman shot them.

Toward the close of trial, defense counsel petitioned the court to include three lesser-included offenses in the instructions to the jury: second-degree unintentional felony murder, third-degree murder, and first-degree heat-of-passion manslaughter. The defense also requested a self-defense instruction. The trial court denied the requests because it found there was sufficient evidence of intent to convict of the charged offenses, noting that the testimony indicated Stiles "intended to kill [Moorman] or to do an act that would have that result." After eleven days of trial, the jury convicted Stiles of two counts of first-degree murder, and one count of second-degree murder. The court then sentenced him to life in prison.

Stiles' defense counsel did not bring a timely direct appeal, but did bring a postconviction appeal.

The postconviction court ruled against Stiles on the two issues he raises here. First, it denied Stiles' request for a new trial based on the trial court's refusal to include lesser offenses in the jury instructions. Second, the postconviction court denied Stiles' contention that any evidentiary errors were a substantial factor in the trial's outcome. Stiles appeals from the decision of the postconviction court.

## I. Lesser-included Offenses

■ Our review of a district court's postconviction ruling is limited. Absent an abuse of discretion, the decision of a postconviction court will not be overturned. *King v. State*, 649 N.W.2d 149, 156 (Minn. 2002).

■ Our case law on lesser-included offenses mandates that the trial court instruct the jury on the requested offense if the defendant establishes three things: the lesser offense is included in the higher charge, the evidence provides a rational basis for acquitting the defendant of the offense charged, and the evidence provides a rational basis for convicting the defendant on the lesser-included offense. *Bellcourt v. State*, 390 N.W.2d 269, 273 (Minn. 1986); *State v. Leinweber*, 303 Minn. 414, 421–22, 228 N.W.2d 120, 125–26 (1975). The mandatory nature of the rule acts as a safeguard within our jury system. As the United States Supreme Court has noted, it safeguards against juries who may be improperly predisposed to find defendants guilty by offering the jury alternatives. *See Keeble v. United States*, 412 U.S. 205, 212–13, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) ("[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction"). If, over the course of a trial, evidence develops that would provide a rational basis to acquit on the charged crime, and the defense counsel requests an instruction on a lesser-included offense supported by the evidence, the judge should grant it lest the jury be left with a Hobson's choice between the higher offense or nothing.

In order for an instruction on a lesser-included offense to function as a safeguard, however, the defendant must meet the legal test outlined above—that the lesser offense is included in the charged offense, and that the evidence provides a rational basis for an acquittal on the offense charged and a conviction on the lesser offense. *Bellcourt*, 390 N.W.2d at 273. If that legal test is not met, a lesser-included offense could improperly provide the means for a jury to express sympathy for the defendant by finding the defendant guilty of an unwarranted lesser charge. The state does not dispute that the three crimes Stiles requested instruction for are all lesser-included offenses of first-degree murder; the only relevant question in this case is whether the postconviction court

abused its discretion in denying relief based on the trial court's refusal to submit the lesser-included offenses to the jury.

Each of the three crimes submitted to the jury included an element of intent. Stiles was charged with two counts of first-degree murder under Minn.Stat. § 609.185(3) (2002): causing "the death of a human being *with intent* to effect the death of the person or another, while committing or attempting to commit burglary, aggravated robbery, * * * or any felony violation of chapter 152 involving the unlawful sale of a controlled substance" (emphasis added). He had also been indicted for intentional second-degree murder under Minn.Stat. § 609.19, subd. 1(1) (2002): causing "the death of a human being *with intent* to effect the death of that person or another, but without premeditation" (emphasis added).

### A. Second-degree Unintentional Felony Murder

Near the close of trial, Stiles requested that the jury receive instructions on second-degree unintentional felony murder. Unintentional felony murder is defined in Minn.Stat. § 609.19, subd. 2(1) (2002), as causing "the death of a human being, *without intent* to effect the death of any person, while committing or attempting to commit a felony offense other than criminal sexual conduct in the first or second degree with force or violence or a drive-by shooting" (emphasis added).

The trial court ruled that there was no rational basis for the jury to convict on unintentional second-degree murder and acquit on first-degree murder and intentional second-degree murder. The postconviction court found that the circumstantial evidence supported a finding that Stiles shot Moorman intentionally, which justified the conviction.

■ Stiles argues that a charge on unintentional second-degree murder was appropriate because "a finding that [Stiles] intended to shoot and kill [Moorman] was only one possible inference from the evidence." Stiles emphasizes that intent to shoot is not the same as the intent to kill required by the statute. Stiles posits that a rational jury could have believed he shot in a panic, without any specific intent to kill Moorman. We disagree.

■ A finding of criminal intent is not limited to situations in which a defendant has stated his or her intent to kill the victim. Intent can be inferred from the words and acts of the shooter before and after the incident, and from the idea that a person intends the natural consequences of his or her actions. *State v. Johnson*, 616 N.W.2d 720, 726 (Minn.2000); CRIMJIG 11.26 (noting that "intent * * * is not always susceptible to proof by direct evidence, but may be inferred from all the circumstances surrounding the event"). In a number of cases, we have noted that pointing a loaded gun at a person and firing it is likely to cause death, and leads to an inference of intent.[1]

The present case is factually very similar to *State v. Dukes*, in which we concluded that the trial court did not abuse its discretion in refusing to instruct on second-degree felony murder (unintentional) because the evidence of intent was too strong for a rational jury to acquit on the intentional felony murder charge. *State v. Dukes*, 544 N.W.2d 13, 20 (Minn.1996). The evidence supporting an inference of

---

1. *See State v. Cole*, 542 N.W.2d 43, 50 (Minn. 1996); *State v. Dukes*, 544 N.W.2d 13, 20 (Minn.1996); *State v. Thompson*, 544 N.W.2d 8, 11 (Minn.1996); *State v. Hanson*, 286 Minn. 317, 325, 176 N.W.2d 607, 613 (1970); *State v. Campbell*, 281 Minn. 1, 13, 161 N.W.2d 47, 55 (1968).

intent in *Dukes* consisted of Dukes planning the robbery, arming himself with a loaded gun, attempting to rob two people, and driving his car to and from the location where his accomplice shot a victim at close range in the course of a robbery. *Id.*

One of Dukes' accomplices testified that he did not intend to kill the victim, just scare him. *Id.* at 17, 20. Dukes attempted to use that testimony to argue that a charge of unintentional killing was appropriate. *Id.* at 20. However, the accomplice testimony in *Dukes* was rejected as insufficient to raise a rational basis to acquit on the intentional murder charge in light of all the other evidence of intent. *Id.* Stiles similarly argues he lacked intent to kill based on Seepersaud's testimony that the group did not intend to kill Moorman. However, the evidence of intent in this case is just as inculpatory as the evidence in *Dukes*—Stiles assisted in planning the robbery, armed himself with a loaded gun, attempted to rob Moorman, and shot him three times in the course of the robbery. In light of this evidence, we conclude that the postconviction court did not abuse its discretion in refusing to grant a new trial based on the trial court's refusal to instruct the jury on second-degree unintentional felony murder.

### B. Third-degree Murder

■ Stiles also requested a jury instruction on the lesser-included offense of third-degree murder. As defined by statute, third-degree murder occurs when an individual *"without intent* to effect the death of any person, causes the death of another by perpetrating an act eminently dangerous to others and evincing a depraved mind, without regard for human life." Minn.Stat. § 609.195(a) (2002) (emphasis added). Third-degree murder occurs when death is caused without intent to kill and "excludes a situation where the ani-

mus of defendant is directed toward one person only." *Id.; State v. Hanson*, 286 Minn. 317, 328–29, 176 N.W.2d 607, 614–15 (1970).

The postconviction court concluded that the evidence did not "rationally support a finding that [Stiles] acted in a manner that was eminently dangerous to more than one person as required by this statute." The court analogized Stiles' request to that denied in *State v. Stewart*, 276 N.W.2d 51, 54 (Minn.1979), and noted that Stiles had an intended victim, whereas third-degree murder is generally used when no specific individual is singled out.

■ Stiles maintains that the evidence at trial rationally supported a conclusion that he did not aim particularly at Moorman, or intend to kill, but fired the gun in panic when he heard that Moorman had a gun. Stiles asks us to distinguish the *Stewart* case by emphasizing that panic ensued after Ueland yelled to the group that Moorman was reaching for his gun.

The facts of this case are analogous to those in *Stewart*, in which we concluded the trial court did not abuse its discretion in failing to submit third-degree murder to the jury. 276 N.W.2d at 54. In *Stewart* we determined that a defendant who had shot his gun twice at the victim without shooting at anyone or anything else, and endangering no one else's safety, had established "no rational basis for a conclusion that [the defendant's] actions were eminently dangerous to more than one person as is required for an instruction of third-degree murder." *Id.* Similarly in this case, the defense has put forward no evidence that Stiles shot at anyone or anything other than Moorman. Given the circumstantial evidence supporting Stiles' intent and the absence of any evidence that Stiles endangered anyone other than Moorman, no rational jury could have acquitted Stiles on intentional murder charges and convicted

on third-degree murder. We hold that the postconviction court did not abuse its discretion in denying a request for a new trial based on the trial court's refusal to instruct the jury on third-degree murder.

## C. First-degree Manslaughter

The final instruction that Stiles sought was first-degree (heat-of-passion) manslaughter. Stiles posits that when Moorman reached for the gun in his waistband, he provoked a passionate response from Stiles, meriting a heat-of-passion manslaughter instruction. First-degree heat-of-passion manslaughter is defined by Minn.Stat. § 609.20(1) (2002) as "intentionally caus[ing] the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances." As heat-of-passion manslaughter contains the element of intent, the key difference between this crime and the crimes charged is the element of provocation. Two elements are necessary for an intentional killing to be mitigated to heat-of-passion manslaughter—the defendant must kill in the heat of passion and the provocation must have been sufficient to induce a person of ordinary self-control under like circumstances. *State v. Buchanan*, 431 N.W.2d 542, 549 (Minn.1988).

The postconviction court was adamant that the facts of this case did not merit a heat-of-passion manslaughter instruction. The court explained that "[t]o suggest that any move by Moorman to protect himself as [Stiles] pointed a loaded shotgun at him should somehow mitigate this homicide to one of heat-of-passion is as absurd as claiming a right to self-defense." In sum, the court said there was no evidence offering a rational basis to acquit on intentional murder and convict on heat-of-passion manslaughter.

In *State v. Thompson*, 544 N.W.2d 8 (Minn.1996), we refused to reduce the appellant's conviction from first-degree murder to heat-of-passion manslaughter, noting that appellant had "provoked the situation which made self-defense necessary and in no way withdrew from that situation." *Id.* at 12. The circumstances of the shooting in *Thompson* were: the appellant was in a car with the victim selling drugs, the appellant became nervous, pulled out a gun and pointed it at the victim, who then pointed his own gun at appellant, at which point appellant shot the victim once. *Id.* at 10. In this case, Stiles and his accomplices were the aggressors in the conflict with Moorman and, therefore, Stiles was not entitled to an instruction on heat-of-passion manslaughter. We hold that the postconviction court did not abuse its discretion in refusing to grant a new trial based on the trial court's refusal to instruct the jury on heat-of-passion manslaughter.

## II. Evidentiary Rulings

Stiles argued to the postconviction court that the state committed two prejudicial errors at trial: the state produced evidence that Stiles was a member of a gang, and the prosecutor asked a question that prompted a potentially prejudicial response from a witness. The postconviction court ruled against Stiles on both issues. We review the court's ruling for abuse of discretion. *King v. State*, 649 N.W.2d 149, 156 (Minn.2002). An abuse of discretion occurs when the court's erroneous ruling substantially influences the jury to convict. *State v. Loebach*, 310 N.W.2d 58, 64 (Minn.1981).

### A. Evidence of Stiles' Gang Affiliation

The state called Suresh Beni as a witness, and Beni testified that Stiles had admitted killing Moorman. On cross-examination, defense counsel attempted to

discredit Beni by asking whether Beni was a member of the Gangster Disciples. Beni admitted membership in the gang, and defense counsel then asked whether Beni would testify against a fellow gang member. Defense counsel was attempting to imply that Beni would lie to protect Seepersaud, a fellow gang member and one of Moorman's shooters. On re-direct, the state was permitted to elicit testimony from Beni that Stiles was also a member of the Gangster Disciples. Stiles argues that Beni's statement that Stiles was a gang member unreasonably prejudiced the jury and constitutes reversible error.

In *State v. Yang*, we held that cross-examination regarding a defendant's gang membership was admissible when it was elicited after defendant claimed he lied about the crime because he was afraid of gang retribution. 644 N.W.2d 808, 817 (Minn.2002). We said the defendant's testimony regarding his fear of gangs "opened the door and allowed the state's cross-examination and rebuttal regarding [appellant's] gang affiliation." *Id.* Additionally, we concluded the testimony was more probative than prejudicial because Yang's testimony had painted an incomplete picture of his relationship to gangs. *Id.*

 The defense similarly opened the door to testimony regarding Stiles' gang affiliation in this case. Stiles raised the issue of gang affiliation in his opening statement and referred to it throughout the trial, notably through cross-examination of witnesses Scott Turner, Suresh Beni, Anthony Slice, and Charlie Seepersaud. Secondarily, the testimony about Stiles' gang affiliation was more probative than prejudicial, as in *Yang*, because the state was permitted to rehabilitate its witness and establish that there was no gang conspiracy to frame Stiles. The postconviction court did not abuse its discretion in finding no prejudicial error by the state in

eliciting testimony from Beni regarding Stiles' gang affiliation.

### B. Evidence Regarding Stiles' Plan to Conceal His Identity

 Stiles alleges that the state elicited a response from Stacy Stegora that alluded to Stiles' initial attempt to conceal his identity, a line of questioning that violated the court's order not to introduce evidence about that topic. The court had ruled that "the fact that [Stiles] gave a false name is not going to be admissible." In response to a question from the prosecutor, Stegora answered that Stiles "said that he was gonna act like he was someone else * * *," at which point the defense objected. Nothing else was said about Stiles' original plan to conceal his identity. Stiles argues that Stegora's remark influenced the jury to doubt other evidence that Stiles did not intend to murder Moorman. The defense never moved to strike Stegora's testimony.

The postconviction court concluded that Stegora's statement was an inadvertent and unexpected answer and was not a substantial factor in the trial's outcome. Even if Stiles could establish the state erred on this point, the postconviction court did not abuse its discretion in declaring that this evidentiary ruling had no substantial impact on the jury's finding. Given the weight of the evidence against Stiles—testimony that Stiles brought a gun to the park, threatened Moorman with the gun, and shot at Moorman three times-the statement by Stegora did not substantially influence the jury to convict. We hold the postconviction court did not abuse its discretion in finding no prejudicial error in the state's questioning of Stegora.

Affirmed.