*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1075**

State of Minnesota,
Respondent,

vs.

Me'Darian Ledale McGruder,
Appellant.

**Filed June 9, 2025
Affirmed
Harris, Judge**

Mower County District Court
File No. 50-CR-21-1467

Keith Ellison, Attorney General, Ed Stockmeyer, Assistant Attorney General, St. Paul, Minnesota; and

Kristen Nelsen, Mower County Attorney, Austin, Minnesota (for respondent)

Sarah R. Gad, Gad & Gad Law Offices, LLP, Minneapolis, Minnesota (for appellant)

Considered and decided by Bentley, Presiding Judge; Ede, Judge; and Harris, Judge.

**NONPRECEDENTIAL OPINION**

**HARRIS**, Judge

In this appeal from a final judgment after a bench trial, appellant challenges his conviction of second-degree intentional murder, arguing that his conviction must be reversed because: (1) the district court's credibility findings are clearly erroneous and unsupported by the evidence; and (2) the state failed to prove beyond a reasonable doubt

that he intended to kill his girlfriend. Because we discern no basis to disturb the district court's credibility findings and conclude that the evidence was sufficient to prove the requisite intent for second-degree intentional murder, we affirm.

**FACTS**

Respondent State of Minnesota charged Appellant Me'Darian Ledale McGruder with second-degree intentional murder under Minnesota Statutes section 609.19, subdivision 1 (2020).[1] The charge arose from a July 2021 incident in which McGruder shot T.G., resulting in her death. The only witnesses to this incident were McGruder and T.G.'s cousin K.G. The matter proceeded to a six-day bench trial, at which both McGruder and K.G. testified. Consistent with applicable law, the facts below summarize the trial evidence, presented in the light most favorable to and consistent with the verdict.

On the night of the incident, K.G. and T.G. went to McGruder's home, which he shared with his friend, R.C., to hang out, listen to music, and drink alcohol. McGruder and T.G. were in a romantic relationship. Later, they went to T.G.'s home, where T.G. took a shower and K.G. ate dinner in her bedroom. After showering, T.G. went into K.G.'s bedroom, where they laughed, whispered, and talked. Soon after, McGruder walked in and

---

[1] The state also charged McGruder with second-degree unintentional felony murder in violation of Minnesota Statute section 609.19, subdivision 2(1) (2020); violent felon in possession of a firearm in violation of 609.165, subdivision 1b (2020); third-degree murder—perpetrating an eminently dangerous act and evincing a depraved mind in violation of Minnesota Statute section 609.195(a) (2020); second degree manslaughter— culpable negligence creating unreasonable risk in violation of Minnesota Statute section 609.205, subdivision (1) (2020); and felony domestic assault in violation of Minnesota Statute section 609.2242, subdivision 4 (2020). The state later dismissed the third-degree murder charge.

2

asked, "y'all in here sneak dissing me?"[2] McGruder had his taser and was playing with it "and "ended up [tasing] [K.G.] just a little bit." This went on for about five minutes.

Sometime after, R.C. walked into T.G. and K.G.'s home. K.G. stated that when R.C. came over, they were "all like play fighting and stuff . . . [but] then [R.C.] ended up leaving because he didn't really care too much about what [they] w[ere] doing." K.G. clarified that by "play fighting," they were "wrestling to get the taser out of [McGruder's] hand." The play fighting moved to the living room, where T.G. "ended up getting [the taser] from [McGruder]." K.G. and T.G. were sitting on the couch and talking to each other, while McGruder paced back and forth looking out the window.

The conversation switched to McGruder and T.G. talking with each other while T.G. played with the taser. Initially, T.G. and McGruder's conversation was "playful, but getting serious playful." T.G. kept "making [the taser] go off," and in response, McGruder said, "If you tase me with that, I am going to pop the sh-t out of you."[3] When McGruder made this statement, he was not playing and there was something about his voice that K.G. had never heard before, which made her think McGruder was serious. McGruder then "took his gun out" with his right hand and "cocked it back" with his left hand. He had never pulled out his gun on K.G. and T.G. before. When he pulled out the gun, McGruder repeated his threat to "pop" T.G. K.G. did not believe that McGruder was joking, and she thought that things were escalating, felt tension in the room, and felt that something was off. At that point, K.G. "gathered all [her] belongings, and [said,] 'Y'all are trippin[g].

---

[2] K.G. testified that "sneak dissing" meant "talking about [someone] . . . behind his back."
[3] K.G. explained that "pop the sh-t out of you" referred to "shoot you."

I'm going to my room.'" After turning to leave, T.G. "zapped [the taser] again." K.G. heard the gun discharge after the "second zap" of the taser, which occurred while K.G. had turned and was going towards her room. The sound of the taser indicated that T.G. never touched or zapped McGruder. When K.G. turned around, T.G. said, "You just f—kin[g]' shot me." K.G. believed that McGruder intentionally shot T.G. because he said that he was going to "pop" her. K.G. saw T.G. still sitting on the couch but did not see where McGruder was because "[e]verything went . . . blank at that moment." K.G. was "scared to see [T.G.] like that, so [she] immediately ran outside" and called the police. Law enforcement arrived at T.G.'s house in less than a minute. Once outside, K.G. saw a "glimpse of [McGruder] running."

After learning that McGruder shot her daughter, T.G.'s mother called McGruder over Snapchat. During the conversation, McGruder stated that T.G. "was playing with a gun and shot herself" and then hung up. T.G.'s mother described McGruder's tone as "hostile" and "nasty" and seemed to have no remorse over T.G.'s death.

The autopsy revealed that the bullet entered K.G.'s body near her right chest, traveled in a straight line down her thoracic and abdominal cavities—striking multiple organs, including her heart—and lodged in her left buttocks. The trajectory of the bullet was "severely downwards," and traveled right to left, and anterior to posterior.

McGruder testified in his own defense. McGruder claimed that T.G. was lunging toward him with the taser and his gun accidently discharged when he jumped back to avoid her. McGruder testified that he didn't mean anything by his statements that he would "pop" T.G., but that he meant is as a warning that the gun could go off. He explained that he had

a prior conviction for second-degree assault and that he left T.G.'s house before the police arrived because he knew that he would get in trouble for possessing a firearm. McGruder placed the gun under some bushes near a street, and later returned with R.C. to retrieve it. McGruder went to Minneapolis for a few days, and then traveled to Chicago where he learned that a warrant had been issued for his arrest. McGruder then went to Mississippi where he was arrested three weeks later. McGruder's father also testified at trial and stated that McGruder told him that he accidentally shot someone.

Dr. Andre Loyd testified for the defense as an expert witness in biomechanics. He reviewed photos of the injuries to T.G. and the scene, police reports, criminal complaints, statements by K.G., a "hypotheticals list," and the autopsy report. Dr. Loyd analyzed two hypothetical scenarios— "jump avoidance" and "standing over shooting." The "jump avoidance" hypothetical was consistent with McGruder's testimony,[4] while the "standing over shooting" hypothetical considered whether it was possible that McGruder intentionally discharged the firearm after T.G. reached toward him with the taser. In both hypotheticals the distance between the muzzle of the gun and the entrance of the gunshot wound was at least six inches away but no more than two-and-a-half feet. Dr. Loyd explained that the wound path was consistent with T.G. lunging at McGruder with the taser from the couch and McGruder reacting by "intentionally firing downward" at T.G. Dr.

---

[4] Dr. Loyd also testified about another hypothetical, which is inconsistent with the verdict, that involved T.G. lunging at McGruder with the taser and McGruder jumping backward and raising his arms to avoid contact with the taser, discharging the firearm in the process. Although Dr. Loyd stated that he was able to recreate the wound path in his analysis of both these hypotheticals, he ultimately said that he could not conclude whether the shooting was intentional or accidental.

Loyd testified that he was able to recreate the bullet wound path in both hypotheticals, but that he could not conclude whether the shooting was intentional or accidental.

The district court found McGruder guilty of second-degree intentional murder under Minnesota Statute section 609.19, subdivision 1, and guilty of violent felon in possession of a firearm under Minnesota Statute section 609.165, subdivision 1b.[5] The district court evaluated K.G.'s and McGruder's conflicting testimony and determined that K.G.'s testimony was "credible in all material respects." The district court observed that, despite inconsistent statements that K.G. provided to law enforcement before trial, her trial testimony about the incident was understandable and credible. The court also concluded that McGruder's testimony was "not credible, and not credible specifically with respect to the events immediately surrounding the discharge of the gun and the cause of that discharge."

The district court entered judgment of conviction and imposed an executed sentence of 386 months for count 1, second-degree intentional murder. It also entered judgment of conviction and imposed a concurrent executed sentence of 60 months for count 4, violent felon in possession of a firearm. The district court did not adjudicate McGruder guilty or impose a sentence on the remaining courts because they were lesser included offenses. McGruder appeals his conviction.

---

[5] The district court also found McGruder guilty of second-degree unintentional felony murder under Minnesota Statute section 609.19, subdivision 2(1); second degree manslaughter—culpable negligence creating unreasonable under Minnesota Statute section 609.205, subdivision (1); and felony domestic assault under Minnesota Statute section 609.2242, subdivision 4.

6

## DECISION

McGruder raises two arguments on appeal. First, he challenges the district court's credibility findings as clearly erroneous. Second, he contends that his conviction must be reversed because there is insufficient evidence that he had the requisite intent to kill T.G. We address each argument in turn.

**I.  In a sufficiency of evidence challenge, we defer to the district court's credibility determinations and see no basis to reassess them.**

First, McGruder argues that we should reverse his conviction on sufficiency of the evidence grounds because the district court's credibility findings are clearly erroneous.[6] The state argues that we should not disturb the district courts credibility determinations because, in a sufficiency of the evidence challenge, appellate courts defer to the district court's credibility findings. We agree with the state.

"When reviewing the sufficiency of the evidence, we carefully analyze the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit the factfinder to reach its verdict." *State v. Latino*, 15 N.W.3d 654, 663 (Minn. 2025). We defer to the district court when it acts as the factfinder in a court trial because it is generally in the best position to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony. *State v. Dickerson*, 481 N.W.2d 840, 843 (Minn. 1992), *aff'd*, 508 U.S. 366 (1993). Even when there is evidence that a witness "[k]nowingly and willfully testified

---

[6] McGruder also argues that K.G. made prior inconsistent statements and failed to credibly recant those statements.

falsely as to a material fact, . . . the credibility of such a witness is, nevertheless, for the [factfinder] and [it] may believe or disbelieve [the] testimony as to other facts." *State v. Stevens*, 80 N.W.2d 22, 26 (Minn. 1956); *see also State v. Harris*, 895 N.W.2d 592, 600 (Minn. 2017) (reaffirming that the circumstantial-evidence standard of review protects the [factfinder's] "unique position" to determine witness credibility). As to credibility findings in particular, factfinders are free credit and discredit different portions of an individual witness's testimony. *Harris*, 895 N.W.2d at 600.

Here, McGruder points to several findings by the district court he believes to be unsupported by the record. For example, McGruder testified that T.G. was "popping rounds out of the gun," causing bullets to fall to the floor. Initially, the district court determined that "no unspent shells from the gun were found on the living room floor after the shooting." But in its amended findings of fact, the district court stated that "BBs were found on the carpeting in [T.G] and [K.G.'s] home." It noted that "[t]he [BCA report] does not indicate specifically where the BBs were found on the carpeting." The district court determined that this additional finding did "not affect or alter the Court's finding that [McGruder's] testimony was not credible regarding the shooting of [T.G.]."

McGruder argues that numerous facts in the record cast doubt on the credibility of K.G., and the district court clearly erred by disbelieving his testimony that he was afraid of accidentally shooting T.G. and that K.G. told him to leave in an attempt to cover for him. McGruder notes that K.G. made several contradictory statements directly related to whether the shooting was intentional or accidental. For example, she first told the detective that McGruder threatened T.G. in a "joking way," and the detective confirmed this in his

8

testimony. And several days after the incident, K.G. told the detective that T.G. and McGruder generally played with BB guns and tasers together. K.G. added that she and "[T.G.] would get BB guns and point them at [McGruder]" and that they "threatened [McGruder] in a playful way." In her initial statement to the detective, K.G. affirmatively said, "It wasn't intentional. . . . They was playing. Literally, he was just playing. . . . They was playing, like we was all joking. We was all playing. We was laughing, literally. It wasn't no argument in between or nothing. We were joking." And according to the detective, "[K.G.] indicated she believed it was an accident." K.G. also stated that they were all drunk, and that right before the shot went off everyone was on good terms and playing around. McGruder points out that K.G.'s initial statements painted a scene that she, T.G., and McGruder were all drunk, joking, laughing, and playfully horsing around— albeit with dangerous weapons—but that there was no bad blood.

The district court made detailed written findings of fact. While McGruder claimed that he did not intend to kill T.G. and that the shooting was an accident, the district court concluded otherwise. The district court considered McGruder's testimony, weighed it against K.G.'s testimony and the crime scene evidence, and found K.G. to be the more credible witness.

As to K.G.'s credibility, the district court directly addressed the inconsistencies with her prior statements. K.G. admitted, and the district court acknowledged, that K.G. made false statements to the detective. The district court found K.G. credibly testified that her initial statements were dishonest because she feared for her safety based on her cousin being shot by McGruder and his close friend R.C. arriving minutes after the shooting,

9

attempting to talk to her, which is supported by the evidence in the record. The district court also found that K.G. was in an "severely heightened emotional state" during the first interview, which is also supported by the evidence in the record. The district court thoroughly discussed its finding regarding K.G.'s explanation about her initial dishonesty and found it logical and credible based on the totality of the evidence.

In sum, as a reviewing court, we must defer to the district court's credibility determinations. *State v. King*, 990 N.W.2d 406, 421 (Minn. 2023). Here, the district court found that K.G.'s trial testimony describing the shooting was credible and that McGruder's testimony was not credible. The district court was in the best position to make credibility assessments, and we see no basis to reassess the district court's credibility findings on appeal.

## II.    The State presented sufficient evidence to sustain McGruder's second-degree intentional murder conviction.

### A.    Legal Standard

Next, McGruder challenges the sufficiency of the evidence underlying his conviction for second-degree intentional murder. The parties agree that the circumstantial evidence standard of review applies. We agree with the parties that a heightened standard of review applies when, as here, the state's evidence on one or more elements of a charged offense does not rely solely on direct evidence. *State v. Porte*, 832 N.W.2d 303, 309 (Minn. App. 2013); *see also Bernhardt v. State*, 684 N.W.2d 465, 477 (Minn. 2004) (stating that a conviction based on circumstantial evidence warrants higher scrutiny).

10

When reviewing the sufficiency of circumstantial evidence, we conduct a two-step analysis. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010). We begin by identifying the circumstances proved by the state. *Id.* In doing so, we "winnow down the evidence presented at trial by resolving all questions of fact in favor of the jury's verdict, resulting in a subset of facts that constitute the circumstances proved." *Harris*, 895 N.W.2d at 600 (quotation omitted). Then, when viewing the circumstances "as a whole and not as discrete isolated facts," we determine whether the reasonable inferences drawn from those circumstances are consistent with guilt and "inconsistent with any rational hypothesis other than guilt." *State v. Smith*, 9 N.W.3d 543, 565 (Minn. 2024). "If a reasonable inference other than guilt exists, then we will reverse the conviction." *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017). We use the same standard of review in bench trials and in jury trials in evaluating the sufficiency of the evidence." *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011).

## B. Circumstances Proved

We begin by identifying the circumstances proved. When viewing all questions of fact in the light most favorable to the guilty verdict, we are left with the following subset of facts as circumstances proved by the state: (1) McGruder had been drinking that night; (2) McGruder possessed a firearm and T.G.'s taser when he walked into T.G. and K.G.'s home; (3) McGruder, T.G., and K.G. were playing around prior to the shooting by wrestling for the taser and tasing each other in a playful manner; (4) T.G. eventually got ahold of the taser from McGruder in the midst of the wrestling and play fighting; (5) K.G. and T.G. were sitting on the couch chatting as McGruder paced throughout the living room;

11

(6) K.G. observed McGruder and T.G.'s conversation become "playful but getting serious"; (7) In response to T.G. activating the taser, McGruder stated "If you tase me with that, I am going to pop the sh-t out of you" and pulled out and cocked back his firearm; (8) McGruder's tone of voice while making the threat was not playful, and was unlike any tone of voice K.G. had heard from him beforehand, which made K.G. think McGruder was serious when he said he was going to "pop" T.G.; (9) McGruder had never pulled out his firearm on T.G. or K.G. before; (10) K.G. felt tension in the room when McGruder threatened again that he would "pop" T.G. if she tased him; (11) Moments before the shooting, McGruder again threatened to "pop" T.G. if she tased him; (12) After K.G. got off the couch and walked towards her bedroom, she heard a zap from the taser immediately followed by a gunshot; (13) The sound of the taser indicated that it never touched or zapped McGruder; (14) T.G. was seated on the couch moments before getting shot, and was seated in that same place when K.G. turned around after the shooting; (15) K.G. believed that McGruder intentionally shot T.G. because he said that he was going to "pop" her; (16) McGruder left the home when K.G. turned around; (17) McGruder did not render aid to T.G. and fled the scene before police arrived; (18) McGruder shot T.G. in the torso, at the base of the neck, and the bullet pierced her heart; (19) R.C. arrived shortly after the shooting and argued with multiple people, scaring K.G.; (20) R.C. helped McGruder leave town; (21) McGruder falsely told T.G.'s mother that T.G. shot herself; (22) T.G.'s mother thought McGruder seemed remorseless after the shooting; (23) McGruder told his father a different story; (24) McGruder disposed of his gun and left the state for over a month; (25) McGruder's trial testimony conflicted with the crime-scene evidence; and

12

(26) Dr. Loyd testified that his analysis of the wound path was consistent with McGruder reacting to T.G. lunging at him with the taser from the couch by "intentionally firing downward" at T.G.

### C. Reasonable Inferences Other Than Guilt

Turning to the next step, we evaluate "independently the reasonableness of all inferences that might be drawn from the circumstances proved," including inferences consistent with a hypothesis other than guilt. *Andersen*, 784 N.W.2d at 329. In doing so, we "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt, not simply whether the inferences that point to guilt are reasonable." *State v. Silvernail*, 831 N.W.2d 594, 599 (Minn. 2013) (quotations omitted). At this stage, we "give no deference to the fact finder's choice between reasonable inferences." *Andersen*, 784 N.W.2d at 329–30 (citation omitted).

The district court found McGruder guilty of second-degree intentional murder, which requires the state to prove beyond a reasonable doubt that McGruder "cause[d] the death of a human being with intent to effect the death of that person or another, but without premeditation." Minn. Stat. § 609.19, subd. 1(1). This is a specific intent crime, which "requires an intent to cause a particular result." *State v. Fleck*, 810 N.W.2d 303, 308 (Minn. 2012). McGruder challenges the second-degree intentional murder verdict, asserting that the state presented insufficient evidence of his intent. The state argues that the circumstances proved are inconsistent with any other hypothesis other than that McGruder had an intent to kill.

13

Intent to kill is proved by evidence that the defendant "had the purpose to kill [the victim] or believed that his actions, if successful, would kill [the victim]." *State v. Colgrove*, 996 N.W.2d 145, 152 (Minn. 2023). "The Legislature has defined the phrase '[w]ith intent to' to mean that 'the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." *Colgrove*, 996 N.W.2d at 152 (quoting Minn. Stat. § 609.02, subd. 9(4) (2022)). Intent to kill is inferred from the totality of the circumstances, "and the fact-finder may infer that a person intends the natural and probable consequences of that person's actions." *Id.* (quotation omitted). Intent is inferred "from words and acts of the actor both before and after the incident." *See State v. Johnson*, 616 N.W.2d 720, 726 (Minn. 2000). And intent can be inferred from the nature and extent of the victim's wounds. *See State v. Harris*, 405 N.W.2d 224, 229 (Minn. 1987) (holding that intent to cause death may be inferred from the manner of shooting); *see also State v. Campbell*, 161 N.W. 2d 47, 55 (Minn. 1968) (explaining "[a] finding of . . . intent to cause death is not dependent upon admission by the accused or other direct proof but, like other facts, may be found by reasonable inference from other evidence[,]" and "[t]he determination to effect death need not exist for any length of time").

The circumstances proved, as discussed above, support the reasonable inference that McGruder intended to kill T.G. In *State v. Thompson*, the supreme court rejected the argument that a shooting was reflexive or unintentional when the defendant shot the victim in the head after the victim pulled a gun on the defendant during an illegal drug transaction. 544 N.W.2d 8, 11-12 (Minn. 1996). In *Thompson*, the appellant was in a car with the victim selling drugs. The appellant noticed the victim fidgeting with his jacket and became

14

nervous for his safety, and pointed a loaded gun at the victim, "demanding to know what was going on." *Id.* at 10. The victim then pointed his own gun at appellant, at which point appellant shot the victim once. *Id.* Here, the state proved that moments before shooting T.G., McGruder threatened to "pop the sh-t out of" T.G. if she activated the taser again. When he made this statement, McGruder was serious and the mood between he and T.G. changed from playful to tense. Shortly thereafter, he also racked his loaded firearm and repeated the threat a second time. The moment T.G. activated the taser again, McGruder discharged the firearm. And unlike the defendant in *Thompson* who arguably communicated a single threat, McGruder made three threats before pulling the trigger: two statements of intent to shoot T.G. and then racking the loaded firearm.

The nature and extent of the T.G.'s wounds further illustrate McGruder's intent. McGruder shot T.G. in the torso at the base of the neck, and the bullet pierced her heart. McGruder's behavior after the shooting also supports a reasonable inference that McGruder intended to kill T.G. McGruder left the home when K.G. turned around, did not render aid to T.G., fled the scene before police arrived, falsely told T.G.'s mother that T.G. shot herself, seemed remorseless after the shooting, told his father a different story, disposed of his gun, and left Minnesota for over a month. This set of circumstances proved by the state is consistent with the hypothesis that McGruder intentionally killed T.G.

In his brief, McGruder seems to acknowledge that the circumstances proved support a reasonable hypothesis that McGruder intended to kill T.G. But he contends that the circumstances also support a rational hypothesis other than guilt—that McGruder was fully engaged in the playful atmosphere that he and T.G. had established. He contends that he

15

drew his gun and racked the slide in a joking manner in response to T.G. playfully tasing him, made the statement that he would "pop" T.G. in the midst of engaging in "trash talking" with T.G. while they were playing, and when T.G. continued to lunge at him with the taser, the gun discharged unintentionally as he tried to evade T.G.

McGruder argues that when T.G. continued to play with the taser, he attempted to avoid contact with the taser and unintentionally discharged the firearm. The state argues that McGruder's accidental-discharge theory is speculation and "manifestly unreasonable."

McGruder claims that the shooting of T.G was an accident. But under the first prong of the sufficiency analysis, we resolve factual disputes in a manner that is consistent with the verdict. *Silvernail*, 831 N.W.2d at 598-99. K.G. testified that McGruder intentionally shot T.G. based on his earlier threat to shoot her. And though McGruder testified the shooting of T.G. was an accident, the district court resolved that factual dispute in favor of the state. The most significant piece of evidence that McGruder's brief focuses on in support of his alternative hypothesis is the playful atmosphere prior to the shooting and infers from the playful nature that the discharge was accidental. However, this focus isolates a single fact and does not account for the totality of the circumstances proved. As stated previously, McGruder and K.G. were playful at one point, but at the time the firearm was discharged, the circumstances proved demonstrate that it was serious and no longer playful.

McGruder also points to the testimony of his expert, Dr. Loyd, in support of his argument. But the circumstances proved included only Dr. Loyd's testimony that T.G. lunged at McGruder with the taser from the couch and McGruder reacted by "intentionally

16

firing downward." Even if we were to consider the remainder of Dr. Loyd's testimony—which we may not, because it is not part of the circumstances proved—Dr. Loyd nonetheless testified that after recreating the bullet wound path, he could not conclude whether the shooting was intentional or accidental. Thus, Dr. Loyd's testimony does not support a rational hypothesis other than guilt that McGruder urges us to accept. And the totality of the circumstances proved do not support McGruder's hypothesis. We cannot overturn a verdict based on mere conjecture or speculation but must instead point to specific evidence in the record that is consistent with innocence. *State v. Al-Naseer*, 788 N.W.2d 469, 480 (Minn. 2010); *see also State v. Ostrem*, 535 N.W.2d 916, 923 (Minn. 1995) (noting that, for an inference to be rational, appellant must point to evidence in the record that is consistent with a rational theory other than guilt). And McGruder points to no other circumstance proved to support his reasonable alternative hypothesis. Thus, McGruder's alternative hypotheses are based on conjecture and are not supported by the record. Upon reviewing the record as a whole, the circumstances proved do not support a rational hypothesis that McGruder accidentally shot T.G. *See Andersen*, 784 N.W.2d at 332 (instructing that circumstantial evidence is viewed as a whole and is not examined in isolation).

In sum, viewing the circumstances proved in the light most favorable to the verdict, and applying the circumstantial-evidence standard, we conclude that there was sufficient evidence to convict McGruder of second-degree intentional murder because the proven subset of facts is "consistent with the hypothesis that [McGruder] is guilty and inconsistent

17

with any other rational hypothesis except that of guilt." *Al-Naseer*, 788 N.W.2d at 473 (quotation omitted).

**Affirmed.**