# STATE v. FRED LOVE, JR.

173 N. W. (2d) 423.

January 5, 1970—No. 41380.

*C. Paul Jones,* State Public Defender, and *Roberta K. Levy,* Assistant State Public Defender, for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Theodore Rix* and *Henry W. McCarr, Jr.,* Assistant County Attorneys, for respondent.

Heard before Knutson, C. J., and Otis, Rogosheske, Sheran, and Graff, JJ.

GRAFF, JUSTICE.*

This appeal is from a judgment of conviction of the crime of aggravated assault in violation of Minn. St. 609.225, subd. 1.

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

Defendant contends on appeal (1) that the evidence presented by the state was insufficient as a matter of law to sustain the jury's verdict; and (2) that defendant was deprived of a fair trial because the trial court's instructions to the jury did not include an instruction that defendant did not have the burden to prove that he acted in self-defense and that the state had the burden to prove that he did not act in self-defense.

1. With respect to the first contention, we have heretofore set forth the standard of appellate review relating to the sufficiency of the evidence as follows:

"In reviewing the sufficiency of the evidence we should emphasize that we do not try the facts anew. Our responsibility extends no further than to make a painstaking review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt, was sufficient to permit the jury to reach that conclusion." [1]

In the light of this settled rule we are satisfied that the jury could have found the following facts: Defendant, age 26, has known one Lucia Rengel since 1959, and for some time thereafter defendant engaged in a meretricious relationship with her. He is the father of her four children, who at the time of trial were of the ages of 5, 4, 2-1/2, and 1-1/2 years. Defendant and Miss Rengel broke up in March 1967 prior to which time she had permitted the defendant to see and take out the children. After March 1967, she did not permit him to do so because according to her testimony, at that time defendant assaulted her with a gun and also hit her and, in addition, she had been told by her social worker that defendant had no right to see the children. Defendant admitted that two caseworkers and a probation officer had instructed him that he could not see the children. Defendant claimed that because Miss Rengel had become the girl friend of

---

[1] State v. Kline, 266 Minn. 372, 374, 124 N. W. (2d) 416, 418, certiorari denied, 376 U. S. 962, 84 S. Ct. 1124, 11 L. ed. (2d) 980, and cases cited in note 2.

the complainant, one James LeRoy Smith, Smith would not allow her to talk to defendant or let him see the children. Smith and defendant had known each other for 10 years.

Defendant claimed on June 8, 1967, he took his sister to see the children at Miss Rengel's apartment but Smith appeared with a gun and told him to leave the children and go. The next day defendant was able to convince Miss Rengel to allow him to take the children out. Defendant said that as he and the children were passing a poolroom, Smith stepped out with a gun and threatened him. Smith stated he merely showed defendant the gun and did not point it at him. He did so because defendant came toward him and shook his finger and threatened him. Defendant stated that after this incident he saw Smith on several occasions and each time Smith would pull a gun or knife. Smith testified that defendant stood in front of him with a gun about a week before August 23, 1967.

Neither defendant nor Smith had ever struck each other prior to August 23, 1967. Shortly before 2 a. m. on that date, Smith and Miss Rengel went to a party at an apartment building in the 1600 block of Plymouth Avenue in Minneapolis. They stayed at the party a half hour or a little longer and then went to an apartment next door, occupied by one Harold Sykes, so Miss Rengel could call a cab to go home, there being no telephone in the apartment they had just left. She had previously used the telephone at Sykes' apartment for the same purpose.

When Miss Rengel and Smith entered Sykes' apartment, the defendant, Sykes, and others were there. Miss Rengel immediately telephoned for a cab and then she and Smith sat down in a middle room between the kitchen and the front room of the Sykes apartment. Miss Rengel and Smith had had no drinks at the party they had just left nor did they have any at the Sykes apartment. Defendant admitted he had three or four drinks before Smith and Miss Rengel arrived at the Sykes apartment. Defendant got up from his seat in the front room near the door and went into the middle room to talk to Miss Rengel. He told her

he wanted his children the following Friday so he could take them to the State Fair. She told the defendant he could not do so. Smith cautioned Miss Rengel not to argue with defendant and not to do anything to make him "more madder." Sykes, Miss Rengel, and Smith all agree that Smith had no conversation with defendant, but defendant claims that Smith taunted him with certain remarks.

When the cab had arrived, Miss Rengel and Smith attempted to leave. Defendant, however, ran to the door and announced that no one was leaving until he received an answer to his question about the children. Smith testified that defendant then pulled a knife stating he was going to stab Smith in the heart. Smith kept his eyes on the knife, but he turned away when Sykes came into the room requesting that there be no trouble. When Smith turned away, he was stabbed by defendant repeatedly in the left arm and chest. Sykes testified he was out of the room when the defendant started stabbing Smith and Miss Rengel testified she was trying to avoid defendant, so neither could state just when defendant pulled out the knife. Defendant claimed that Smith threatened him while they were standing at the door and that Smith began to beat him about the head with an umbrella Smith had with him. Defendant stated it was then that he took out his knife and began to stab Smith. Defendant admitted stabbing Smith in the face and chest and stabbing him again after Smith fell into a chair. Part of the stabbing was witnessed by Miss Rengel. Smith stated it was not reasonable for him to get to a rear door of the apartment with the defendant "standing there against me and I had to turn my back on a knife." Defendant testifed that he knew of the rear door and had used it on previous occasions.

Smith pleaded with defendant to let him up since he was hurt and wanted to go to the hospital. Sykes intervened with a request to let Smith go, that he was hurt and wanted to leave. Defendant then stopped his attack and permitted Smith to be helped from the room. Sykes states that blood was everywhere on

Smith. Miss Rengel stated that she started to help Smith but defendant grabbed her by the top of her raincoat, she slid down three or four stairs, and defendant either kicked or hit her in the eye.

Smith was taken to the hospital by a friend who was just driving up as Smith and Miss Rengel got to the street. The resident surgeon who operated on Smith stated that he observed six wounds in Smith's body and that they appeared to be caused by a sharp instrument. Three wounds were in the chest, and Smith's lung and heart had been punctured. Upon arrival at the hospital, Smith was in deep shock, and the resident surgeon described his condition as "a shade sicker than critical" and as close to death as one can be and still live.

Smith claimed that he used his umbrella only in an effort to protect himself from blows struck by defendant, while defendant claims Smith initiated the affray by striking him with the umbrella. If the jury believed Smith initiated the encounter with his umbrella, they could reasonably have found that defendant used more than reasonable force to defend himself.[2] If the jury believed Smith did not start the encounter, then of course there is no question of justification. Before Smith backed into the chair, defendant admits that he had stabbed Smith in the face and chest. Defendant admits he stabbed Smith while he was in the chair but claims he thought Smith was reaching into the pocket of his trenchcoat for a gun. There was no evidence that Smith had a gun in his possession on August 23, 1967. It was for the jury to determine whether defendant had the actual and honest belief that he was in imminent danger of death or great bodily harm and that it was necessary to take the action he did, and also to determine whether there existed reasonable grounds for such belief.[3] We are convinced that by any reasonable

---

[2] State v. Norlander, 277 Minn. 463, 152 N. W. (2d) 774. See, also, Minn. St. 609.06(3).

[3] State v. Johnson, 277 Minn. 368, 152 N. W. (2d) 529.

standard the record as a whole supports the jury's finding that defendant was guilty of aggravated assault.

2. The second contention is that the defendant was denied a fair trial because the trial court's instructions to the jury did not include an instruction that defendant did not have the burden to prove that he acted in self-defense and that the state has the burden to prove that the defendant did not act in self-defense. The prosecution in its argument to the jury simply stated there was no self-defense. The defense in its argument to the jury argued that the defendant was provoked, and while self-defense was mentioned three times, the principal argument was that there was justification for defendant's acts and that "the entire burden is upon the state to show that there was no justification." The record does not disclose any oral or written requests for instructions by either side. After the instructions to the jury were completed and before the bailiffs were sworn and the jury retired for deliberation, the trial court asked counsel on both sides, "* * * do either of you wish to call the Court's attention to any errors or misstatements or omissions in the charge?" They responded in the negative.

A careful examination of the trial court's instructions indicates the following: The jury was told on a number of occasions that defendant was not required to prove his innocence but that the burden of proof was upon the prosecution to establish defendant's guilt beyond a reasonable doubt; that the state was required to prove every essential element of the crime beyond a reasonable doubt; and that it was necessary to prove intent (as well as the other essential elements). The court explained intent fully. Regarding self-defense, the court said:

"It is lawful for a person who is being assaulted and who has reasonable grounds to believe that bodily injury is about to be inflicted upon him, to stand his ground and defend himself from such attack, and in doing so he may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circum-

stances, to be necessary to prevent the injury which appears to be imminent.

"A person who has been attacked and who is exercising his right of lawful self-defense is not required to retreat, and he not only may stand his ground and defend himself against the attack but may also pursue his assailant until he has secured himself from danger if that course appears to him, and would appear to a reasonable person in the same situation, to be reasonably and apparently necessary, and this is his right even though he might more easily have gained safety by withdrawing from the scene.

"Where a person seeks or induces a quarrel which leads to the necessity in his own defense of using force against his adversary, the right to stand his ground and thus defend himself is not immediately available to him, but, instead he first must decline to carry on the affray, must honestly endeavor to escape from it, and must fairly and clearly inform his adversary of his desire for peace and of his abandonment of the contest. Only when he has done so will the law justify him in thereafter standing his ground and using force upon his antagonist.

"The kind and degree of force which a person may lawfully use in self-defense are limited by what a reasonable person in the same situation as such person, seeing what he sees and knowing what he knows, then would believe to be necessary. Any use of force beyond that is regarded by the law as excessive. Although a person may believe that he is acting, and may act, in self-defense, he is not justified in using a greater degree of force than that permitted by the rules just stated to you. Thus, although one has been unlawfully attacked, he may not in the name of self-defense inflict further or any injury upon an erstwhile assailant after danger from the assailant no longer exists, as the situation would appear to a reasonable man in the same position.

"The rule of self-defense does not authorize one to seek

revenge or to take into his own hands the punishment of an offender.

"The law does not permit or justify one who intends to commit an assault upon another to design in advance his own defense by instigating a quarrel or a combat with a view thereby to create a situation wherein the infliction of the intended injury will appear to have been done in self-defense."

A careful reading of the trial court's instructions satisfies us that they were fair, complete, logically arranged, and legally sound.[4] However, the instructions did not say specifically that defendant had no burden to prove that he acted in self-defense and that the state had the burden to prove that he did not act in self-defense. The question here is whether under the circumstances of this case, absent a request for instructions pertaining to the burden of proof where self-defense is asserted, does the failure to give such instructions deprive the defendant of a fair trial. We hold that under the circumstances of this case the failure to give such instructions did not deprive defendant of a fair trial.

We have held that where there is a timely request for an instruction that there is no burden upon the defendant to prove that he acted in self-defense and that it is the burden of the state to prove that the defendant did not act in self-defense, it is prejudicial error not to give such instruction.[5] Whether the failure to give a certain instruction is reversible error, absent a request therefor or absent an objection thereto, must necessarily be determined by the facts in each particular case. Here the trial court merely omitted a direct statement concerning the burden of proof on the self-defense issue. As has been noted, there were complete instructions on self-defense and justification. We have held that

---

[4] The subject of jury instructions and the cases relating to this subject are contained in 5A Dunnell, Dig. (3 ed.) § 2479, et seq., and 19 Dunnell, Dig. (3 ed.) § 9781, et seq.

[5] State v. McPherson, 114 Minn. 498, 131 N. W. 645; State v. McGrath, 119 Minn. 321, 138 N. W. 310.

a new trial cannot be granted unless it is shown that the error was one of fundamental law or controlling principle and that it substantially and materially prejudiced the defendant's rights.[6] The entire circumstances of this case; the failure to request such an instruction; the failure to object to the omission of such instruction; the clearness and comprehensiveness of the trial court's instruction; and the fact that the record as a whole supports the conviction compel the conclusion that the omission complained of did not deprive defendant of a fair trial.

Affirmed.

---

[6] State v. Keaton, 258 Minn. 359, 365, 104 N. W. (2d) 650, 655, 86 A. L. R. (2d) 649; State v. Billington, 241 Minn. 418, 427, 63 N. W. (2d) 387, 393; State v. Braman, 281 Minn. 91, 93, 160 N. W. (2d) 575, 576.