**STATE of Minnesota, Respondent,**

**v.**

**Brian Keith EDWARDS, Appellant.**

No. A04–2396.

Supreme Court of Minnesota.

July 13, 2006.

John M. Stuart, State Public Defender, Davi Elstan Forte Axelson, Assistant Public Defender, Minneapolis MN, for Appellant.

Mike Hatch, Attorney General—Criminal, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

Appellant Brian Keith Edwards appeals from the judgment of his conviction of first-degree murder, in violation of Minn. Stat. § 609.185(a)(3) (2004), in connection with the shooting death of Timothy Oliver. He argues that he was denied a fair trial by the admission of opinion testimony on a legal issue and by the submission of a jury instruction on an aggressor's right to claim self-defense. We affirm.

In the early morning hours of January 28, 2004, Oliver was shot and killed in an exchange of gunfire with Edwards in the 2100 block of Elliot Avenue in South Minneapolis. Edwards was seated in the driver's seat of a Dodge Caravan and Oliver was outside the vehicle by the front passenger window. Witnesses identified Edwards as the shooter. Police arrested and questioned Edwards several hours later. Edwards initially told the police that he was home asleep at the time of the shooting. Then he said he was in the back seat of the van and that the driver, somebody named "D," was the shooter. Eventually, Edwards admitted he shot Oliver but told the police that Oliver shot first.

Edwards was indicted by grand jury for first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2004), and intentional drive-by-shooting murder, Minn.Stat. § 609.185(a)(3). At trial, the owner of the Dodge Caravan, Johnny Joshua, testified that he agreed to let Edwards use his vehicle in exchange for some crack cocaine. Later on, they picked up Edwards' fianceé Satociaree Wilson and a friend, Roshawn Douglas. Wilson sat in the front passenger seat, Douglas in the second-row bench seat, and Joshua in the third-row bench seat. When Edwards drove down Franklin Avenue, he passed Cordale Moore and Oliver, who were walking to a friend's house nearby. Wilson pointed them out to Edwards and identified Oliver as someone who had threatened to shoot her. Moore testified that Edwards "mean mugged" them (gave them an intimidating glance) and made a "wild right" at the corner. When Moore and Oliver reached the next block, Moore saw the van parked there, as though Edwards was watching them.

At 21st and Chicago, Oliver and Moore got into David Porter's Ford Crown Victoria. Moore was in the front passenger seat and Oliver was in the back seat next to his aunt, Alice Jones. Eventually, the two vehicles met near the intersection of 21st and Elliot and stopped next to each other, at which point Edwards and Oliver exchanged words. The van owner heard Edwards say, in an urgent or angry voice, that he needed to talk to Oliver. Moore, who was in the Crown Victoria, heard Edwards speak in a normal voice. Jones, also in the Crown Victoria, heard Edwards say "something about spraying the mother - - - - - -s." Edwards then drove the van up Elliot and made a U-turn. He had a gun on his lap. The van owner saw Edwards put on his gloves; and he said, "Please don't do this in my car." [1]

Moore and Jones (occupants of the Crown Victoria) and the van owner said that Porter backed the Crown Victoria into a driveway. Oliver got out of the Crown Victoria and walked to Moore's Buick Regal that was parked on the street. He popped the hood, briefly went under the hood and closed it. Meanwhile, Edwards stopped the van next to the Buick Regal and said something like, "hurry up man, I need to talk to you" or yelled "come on." None of the witnesses saw anything in Oliver's hands as he approached the passenger side of the van. The van owner said that after a short conversation, Oliver stepped back, Edwards raised his gun, leaned over Wilson and fired at Oliver. Moore and Jones (who were in the Crown Victoria) said that after Edwards started shooting, Oliver stumbled back, pulled out a gun and returned fire as the van sped off. Jones testified that the van had no problem leaving the area. Moore, Porter

---

1. A homicide investigator testified that a shooter puts on gloves to avoid contact with gun residue; but another investigator testified that the presence or absence of gun residue on a shooter's hands is meaningless.

and Jones picked Oliver up, placed him in the Crown Victoria and drove to the Hennepin County Medical Center where Oliver was pronounced dead. The cause of death was a gunshot wound to the chest.

One of the bullets penetrated the front passenger door of the van, wounding Wilson in the ankle. The van owner said that Edwards drove to St. Paul where they dropped Wilson off at a hospital. He said that Edwards worked out a story for Wilson to tell the police.

Other evidence at trial related to the homicide investigation during which the police recovered 11 discharged cartridge casings in the area of the shooting and a SigSauer 9 millimeter semiautomatic handgun, with a 13–plus–one capacity, from the Crown Victoria. The magazine was empty. The police found a .380 Lorcin semiautomatic handgun, with a 14–plus–one capacity, lodged in a couch during the execution of a search warrant at Edwards' apartment in St. Paul. The chamber was empty and the magazine contained 11 rounds. The police also located and processed the van, which had 12 bullet holes in the right front passenger door, one of which was just under the front passenger window and another in the area of the door handle. The majority of the bullet holes were in the lower half of the door. The forensic evidence indicated that the van was in motion when the "high-up" bullets struck the vehicle and were unlikely to hit the van's occupants. Photographs of the crime scene indicated that the street had been plowed and pavement exposed.

Edwards testified on his own behalf and asserted that he acted in self-defense. He said that he shared an apartment in St. Paul with Wilson, that he sold drugs in South Minneapolis for a living and that Wilson sold drugs on the street for him. He said that some people were upset that he was cutting into their drug trade, that Wilson told him Oliver had been shooting at her and the word on the street was that Oliver wanted to shoot him, too.

Edwards said that he took a bus from St. Paul to the area in South Minneapolis where he normally sold his drugs, "rented" Joshua's van and drove around the area trying to sell his drugs. It was cold, and he was wearing gloves the whole night. As was his routine, he had his gun on his lap with a bullet in the chamber. He explained that he had been the victim of a carjacking and had been seriously injured by gunfire, which caused permanent injury to his stomach and the loss of one leg. He said that, because of that experience and the fact that he carries large sums of cash, he always had a gun on his lap when he was in a motor vehicle.

Edwards disputed that he "mean mugged" or cast a threatening glance at Moore and Oliver, testifying instead that he stopped and asked Oliver if he could speak with him. Later, when the two vehicles stopped next to each other, Edwards again asked to speak with Oliver; and Oliver agreed. Edwards said that Oliver first came up to the front passenger window of the van, where Wilson was seated, said that he was going to put his gun away, walked over to the Buick Regal, went under the hood, closed it and returned to the van. Edwards asked Oliver why he (Oliver) wanted to shoot Wilson and him (Edwards). He then heard the sound of a gun being charged (which he acknowledged required the use of both hands), "grabbed [his own] gun, did like this (indicating) and pulled [the] trigger." He stepped on the accelerator but his tires spun until the van jumped and he could drive off. Edwards said Oliver fired the first shot.

Edwards testified that he did not leave when he heard the sound of the gun being

charged because he was afraid Oliver would shoot him in the back of his head. He admitted that he lied to the police but explained that he did not trust them. He acknowledged that he told the police that "[i]t was self-defense," that he was trying to resolve "this issue" and that "[y]ou would not want to see your girlfriend out there getting hurt if she's making money for you, now, would you?"

The jury returned a verdict of not guilty of first-degree premeditated murder but guilty of first-degree intentional murder while committing a drive-by shooting. Judgment of conviction was entered and Edwards was sentenced to life in prison. This appeal followed.

### I.

Edwards' first claim of error is the admission of testimony by William James, a forensic scientist with the Minneapolis Police Department. James testified that he used "trajectory rods" (long wooden dowels) to connect the locations where each of Oliver's bullets passed through two surfaces of the van that Edwards was driving. James testified that he could determine (1) "somewhat the distance, possibly, that somebody was standing from the vehicle," (2) "whether or not the vehicle or the person, the shooter was in motion," and (3) the "approximate angle and direction of those fired bullets."

The disputed testimony arose on redirect examination by the state:

Q: Were any of those——well, and if the person who was firing the bullets, based on your analysis and you [sic] observations and your training, the person firing those bullets into the van were wanting to strike either the front passenger or the driver, were any of those bullets in the direction or the angle would be even remotely likely to hit those two individuals?

[Defense Attorney]: Objection, Your Honor. Calls for speculation. Lack of foundation.

[The Court]: Overruled. You can answer, if you can.

A: If I was intent on shooting the passenger or the driver, the bullets would be much higher, the bullet strikes would be much higher. They would be at least pointed towards, you know, the level of the window.

Because James was not testifying as an expert on this issue, the admissibility of his opinion was governed by Minn. R. Evid. 701:

If the witness is not testifying as an expert, the witness' testimony in the form of opinion or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

■ Edwards argues that James's testimony was not admissible because it was not helpful to the jury. He characterizes the testimony as James's opinion on Oliver's intent, and compares it to opinion testimony that we have held inadmissible in other cases. *See State v. Chambers,* 507 N.W.2d 237, 239 (Minn.1993) (holding that it was error to admit opinion testimony by a forensic pathologist on the question of intent); *State v. Provost,* 490 N.W.2d 93, 101–04 (Minn.1992) (holding that the district court properly excluded defendant's proffered psychiatric testimony on the questions of intent and premeditation); *State v. Saldana,* 324 N.W.2d 227, 229–31 (Minn.1982) (holding that it was reversible error to allow opinion testimony from a sexual assault counselor on whether the victim had "typical post-rape symptoms and behavior of rape victims" and on whether the victim was telling the truth).

Edwards focuses on the prosecutor's use of words in the question—"if the person who was firing the bullets * * * were wanting to strike"—and words used by James in prefacing his answer—"[i]f I was intent on shooting."

The state concedes that the question was "perhaps inartfully phrased" but argues that *Chambers, Provost,* and *Saldana* are inapposite because James's use of the word "intent" did not refer to his legal opinion on *mens rea,* but rather his factual opinion as to whether the bullets were likely to hit the vehicle's occupants. The state says the issue is not whether Oliver wanted to shoot the occupants of the van, but whether he was "firing from a position in relation to the van that would enable him to take aim, or [if he was] falling down as he fired bullets into a moving van."

We agree with the state's characterization of the testimony. In context, it is apparent that the testimony related to the likelihood of Oliver's shots hitting the vehicle's occupants, not to Oliver's intent when firing them. The apparent purpose of this testimony was to raise the inference that because the bullets were at angles and locations in the car that made them unlikely to hit the occupants, something (like a gunshot wound) interfered with Oliver's aim. Although the question was poorly worded, admission of the testimony was not an abuse of discretion. *See State v. Salazar,* 289 N.W.2d 753, 755 (Minn.1980).

## II.

Over Edwards' objection, the district court instructed the jury on an aggressor's right to a claim of self-defense. The court used CRIMJIG 7.07, which states:

> If the defendant began or induced the incident that led to the necessity of using force in the defendant's own defense, the right to stand the defendant's ground and thus defend himself is not immediately available to him. Instead, the defendant must first have declined to carry on the affray and have honestly tried to escape from it, and must clearly and fairly have informed the adversary of a desire for peace and of abandonment of the contest. Only after the defendant has done that will the law justify the defendant in thereafter standing his ground and using force against the other person.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 7.07 (4th ed. 1999). Edwards argues that there was no basis in the evidence for submission of the instruction and that the instruction misstates the law.

*Factual Basis for CRIMJIG 7.07.* Edwards asserts that there was no evidence that he instigated anything more than a conversation. The decision to give a jury instruction is within the discretion of the district court. *State v. Broulik,* 606 N.W.2d 64, 68 (Minn.2000). But a party is entitled to a jury instruction if there is evidence to support it. *State v. Daniels,* 361 N.W.2d 819, 831–32 (Minn.1985). In evaluating whether a rational basis exists in the evidence for a jury instruction, the evidence is viewed in the light most favorable to the party requesting the instruction. *See State v. Dahlin,* 695 N.W.2d 588, 597 (Minn.2005).

Under Minn.Stat. § 609.065 (2004), "[t]he intentional taking of the life of another is not authorized * * * except when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death."[2] In addition, the ab-

**2.** Minnesota Statutes § 609.065 provides:

The intentional taking of the life of anoth-

sence of aggression or provocation by the actor is required before self-defense may be claimed. *State v. Thompson,* 544 N.W.2d 8, 12 (Minn.1996). Further,

> [t]he law does not permit or justify one who intends to commit an assault upon another to design in advance his own defense by instigating a quarrel or a combat with a view thereby to create a situation wherein the infliction of the intended injury will appear to have been done in self-defense.

*State v. Love,* 285 Minn. 444, 451, 173 N.W.2d 423, 427 (1970) (quoting trial court's instructions). Nevertheless, if an aggressor withdraws from the conflict and communicates that withdrawal, expressly or impliedly, the right to claim self-defense is restored. *Bellcourt v. State,* 390 N.W.2d 269, 272 (Minn.1986).

Evidence indicating that Edwards was the initial aggressor included testimony that he was driving around with a charged semiautomatic handgun, ready to be fired, on his lap; that he was trying to resolve a drug-territory problem with Oliver; that he gave Oliver a threatening look and twice initiated contact; that when he put on gloves, the van owner "knew something was going to go down and it wasn't right" and said, "God, please don't let me get shot. * * * Please don't do this in my car"; and that he called Oliver over to the van and shot Oliver before Oliver pulled out his handgun. This provided a rational basis for the jury to conclude that Edwards "began or induced the incident that led to the necessity of using force in the defendant's own defense." CRIMJIG 7.07.

*Legal Accuracy of CRIMJIG 7.07.* In instructing the jury on Edwards' right to a claim of self-defense, the district court chose not to alter the language provided by CRIMJIG 7.07. We have stated that the district court has "considerable latitude in the selection of the language of a jury charge." *State v. Pendleton,* 567 N.W.2d 265, 268 (Minn.1997). But "jury instructions must not materially misstate the law." *State v. Hare,* 575 N.W.2d 828, 833 (Minn.1998). Edwards argues, and the dissent agrees, that the first sentence of CRIMJIG 7.07 materially misstates the law because the words "began or induced the incident" permitted the jury to find that he was the initial aggressor merely because he started a conversation with Oliver. Jury instructions are viewed in their entirety to determine whether they fairly and adequately explained the law of the case. *State v. Jones,* 347 N.W.2d 796, 801 (Minn.1984).

CRIMJIG 7.07 was drawn from instructions on self-defense that we described, more than 35 years ago, as "fair, complete, logically arranged, and legally sound." *Love,* 285 Minn. at 451, 173 N.W.2d at 427. In *Love,* a portion of the instructions read as follows:

> Where a person seeks or induces a quarrel which leads to the necessity in his own defense of using force against his adversary, the right to stand his ground and thus defend himself is not immediately available to him, but, instead he first must decline to carry on the affray, must honestly endeavor to escape from it, and must fairly and clearly inform his adversary of his desire for peace and of his abandonment of the contest.

*Id.* at 451, 173 N.W.2d at 426. It is true that trial courts must use analytical precision in drafting instructions on self-defense

---

er is not authorized by section 609.06, except when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death, or preventing the commission of a felony in the actor's place of abode.

and should modify pattern jury instructions when necessary. *State v. Marquardt*, 496 N.W.2d 806, 806 (Minn.1993) (stating that jury instructions on self-defense should have been modified to fit the contentions of the parties). But Edwards did not request that CRIMJIG 7.07 be modified or supplemented.

Contrary to Edwards' suggestion, CRIMJIG 7.07 does not permit a jury to ground forfeiture of the defense simply on conversation. In the context of the instruction, the natural understanding of the word "incident" is that of a quarrel or conflict with potentially serious consequences. The instruction uses the words "affray" and "contest" interchangeably with "incident." The instruction requires that the defendant have a "desire for peace" before the right of self-defense is restored. When read as a whole, the instruction contemplates conduct that is a good deal greater than mere conversation.

The dissent, in articulating concern over the pattern jury instruction, takes the position that the formulation of a forfeiture rule should focus on the legal justification of the victim's response to the aggressor's initial conduct. The Model Penal Code has a narrow forfeiture rule, holding an initial aggressor "accountable for his original unlawful use of force but not for his defense against a disproportionate return of force by his victim." Model Penal Code § 3.04 cmt. 4(b) (1985). And Professor Robinson has proposed a culpability analysis that would assess the aggressor's liability on the basis of the level of culpability shown in the earlier conduct of causing the conditions of his own defense. Paul H. Robinson, *Causing the Conditions of One's Own Defense: A Study in the Limits of Theory in Criminal Law Doctrine*, 71 Va. L.Rev. 1, 27 (1985). "There is, however, much authority, both common law and statutory, demanding that a person claiming self-defense be free from fault in bringing on the difficulty." Model Penal Code § 3.04 cmt. 4(b) (footnotes omitted). Professor Dripps has observed that the law "appears to follow the forfeiture-by-wrongdoing model at least as often as it follows culpability analysis." Donald A. Dripps, *Fundamental Retribution Error: Criminal Justice and the Social Psychology of Blame*, 56 Vand. L.Rev. 1383, 1413 (2003).

In general, justification as a defense focuses on the reasonableness of the actor's beliefs and the necessity of his acts. Deadly force is justifiable only if the actor "reasonably believes that the other is about to inflict unlawful death or serious bodily harm upon him (and also that it is necessary to use deadly force to prevent it)." 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.4(b) (2d ed. 2003); *see also* Minn.Stat. § 609.065. If the actor's belief is reasonable, "he may be mistaken in his belief and still have the defense." LaFave, *supra*, § 10.4(c). The Model Penal Code, however, allows the use of force on the actor's belief but sets certain "limitations on the exculpation worked by an erroneous belief." Model Penal Code § 3.04 cmt. 2(d). In that justification focuses on the actor's beliefs and acts, we do not view the formulation of a forfeiture rule that focuses on the legal justification of a victim's response to the aggressor's acts as consistent with the policy choices of Minn.Stat. § 609.065.[3]

---

**3.** Neither are our prior cases consistent with the formulation of a forfeiture rule that focuses on the legality of the victim's response. *See, e.g., Thompson*, 544 N.W.2d at 12–3 (declining to reduce murder to manslaughter on theory of imperfect self-defense); *State v. Gray*, 456 N.W.2d 251, 258 (Minn.1990) (stating that evidence suggesting the victim at times may have had the upper hand in the struggle with the initial aggressor was not a

■ Nonetheless, even assuming CRIMJIG 7.07 as worded has the potential for misleading a jury, we believe any error in the submission of the instruction in this case was harmless. An error in jury instructions is harmless if it can be said beyond a reasonable doubt that the error had no significant impact on the verdict. *State v. Olson,* 482 N.W.2d 212, 216 (Minn. 1992). Our review of the record convinces us that submission of CRIMJIG 7.07 was harmless because the verdict reflects that the elements of self-defense had not been satisfied.

■ Three conditions must occur to excuse or justify the use of deadly force under Minn.Stat. §§ 609.06, 609.065 (2004):

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*State v. Austin,* 332 N.W.2d 21, 24 (Minn. 1983) (quoting *State v. Boyce,* 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969)).[4] There is a duty to retreat and avoid danger if reasonably possible. *Austin,* 332 N.W.2d at 24. The duty to retreat relates to the election to kill, making a killing unjustified if the danger was reasonably avoidable. *Id.* The justification that exonerates a defendant from criminal responsibility for the use of deadly force is limited by an objective standard where society would agree that the use of deadly force was necessary and a part of that objectivity analysis includes the duty to retreat if at all possible to avoid the harm. *See Boyce,* 284 Minn. at 255, 170 N.W.2d at 113 (stating that justification depends on the quality of a defendant's "judgment with respect to the danger to be apprehended from others and the alternative methods by which the danger could have been avoided").

Here, Edwards was in the driver's seat of the van that was stopped in the middle of the street, the engine was running, nothing was blocking his exit, and Oliver was on foot outside. Forensic evidence indicated that Oliver was approximately 15 feet away from the van. Crime scene photographs indicated driving conditions were good and Edwards testified that he "busted a U-turn" on Elliot just before the shooting. In closing argument, the state focused not on the forfeiture of the right to claim self-defense but, rather, on the duty

legally sufficient withdrawal); *State v. Boitnott,* 443 N.W.2d 527, 532–33 (Minn.1989) (holding that short break in armed trespasser's otherwise continuous stream of verbal threats and threatening gestures with his handgun did not constitute an actual or good faith effort to withdraw from the conflict); *Bellcourt,* 390 N.W.2d at 272–73 (holding that armed robber who was holding five people at gunpoint at the time he was shot by liquor store owner and fell to the floor had not withdrawn from the crime).

4. The burden is upon the state to prove beyond a reasonable doubt that the killing was not justifiable. *State v. Columbus,* 258 N.W.2d 122, 123 (Minn.1977). Self-defense in Minnesota is regarded as a justification rather than an excuse. *See id.* at 124. While the term "legal justification" and "excuse" are often used interchangeably, they are distinct legal concepts. *See, e.g.,* Kevin Jon Heller, *Beyond the Reasonable Man? A Sympathetic but Critical Assessment of the Use of Subjective Standards of Reasonableness in Self–Defense and Provocation Cases,* 26 Am. J. Crim. L. 1, 9–11 (1998); Joshua Dressler, *New Thoughts About the Concept of Justification in the Criminal Law: A Critique of Fletcher's Thinking and Rethinking,* 32 UCLA L.Rev. 61, 65–67 (1984).

to retreat and avoid the danger; defense counsel argued that Edwards "had to kill or be killed"; and the jury was instructed on the duty to retreat.

A careful review of the evidence reflects that the central issues at trial were whether Edwards acted with premeditation or whether he acted as a reasonable person in using deadly force. Intent was not in serious dispute. That the evidence of aggression related to premeditation but the jury acquitted Edwards of premeditated murder, convicting him instead of the drive-by shooting offense, indicates the jury answered the latter question in the negative. Under the circumstances of this case, submission of the instruction on an aggressor's right to a claim of self-defense was not prejudicial.

Affirmed.

ANDERSON, PAUL H., J., files concurring opinion.

HANSON, J., dissents with opinion in which PAGE and MEYER, JJ., join.

ANDERSON, PAUL H., Justice (concurring).

I concur. In so doing, I agree with the dissent's concern that CRIMJIG 7.07 on self-defense may misstate the law and is in need of revision. Nevertheless, the facts of this case do not establish that appellant Brian Keith Edwards met his duty to retreat if at all possible to avoid any threatened harm presented by Timothy Oliver. For this reason, I agree with the majority's alternative conclusion that any error in the submission of the instruction was harmless. Therefore, I agree that Edwards' conviction should be affirmed.

HANSON, Justice (dissenting).

I respectfully dissent. I conclude that it was error to instruct the jury by use of CRIMJIG 7.07, and that such error was not harmless.[1] Accordingly, I would reverse Edwards' conviction and remand for a new trial.

The critical fact issue for the jury to resolve at trial was which person was the first to use or threaten to use deadly force. The state's evidence suggested that Edwards aimed and fired his gun first. Edwards testified that Oliver aimed and fired his gun first.

If we accept the state's evidence as true, Edwards' use of deadly force would not have been in response to anything that Oliver did and could not be considered an act of self-defense. The general self-defense instruction makes clear that self-defense is not available to the person who uses deadly force first, without justification. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 7.05 (4th ed. 1999). Thus if the jury found that Edwards shot first, there would be no need for either a self-defense or a self-defense forfeiture instruction because Edwards could not have been acting in self-defense.

Edwards' version of the facts does present a self-defense issue. If we accept Edwards' testimony as true, Edwards would be entitled to the general self-defense instruction because Edwards' use of deadly force would have been in response to Oliver's prior use of deadly force. Whether a self-defense forfeiture instruction would be appropriate under Edwards' version of the

---

**1.** Although the plurality opinion mentions the fact that defense counsel did not request a specific modification of CRIMJIG 7.07, it does not suggest that this has any legal significance on the standard of review. I agree that this fact should not have any legal significance because Edwards objected to *any* use of CRIMJIG 7.07. Thus, the standard of review is harmless error, not the elevated standard of plain error.

facts depends on whether any of the preliminary actions taken by Edwards were sufficient to justify the use of deadly force by Oliver. But, even if a self-defense forfeiture instruction was appropriate, the use of CRIMJIG 7.07 was error because it misstates the law by allowing the jury to find forfeiture based on actions that were not sufficient to justify the use of deadly force by Oliver, such as merely inducing a conversation.

Because I cannot determine with any degree of certainty how the jury resolved the fact issue of who shot first, I cannot say that the error in instructing the jury by use of CRIMJIG 7.07 was harmless. In other words, I cannot eliminate the possibility that the jury believed Edwards' testimony that Oliver shot first and Edwards only shot in response, but rejected Edwards' claim of self-defense because the jury concluded, incorrectly from CRIMJIG 7.07, that Edwards had forfeited his right to self-defense by inducing the conversation.

## I.

### A. *Background*

To determine whether a self-defense forfeiture instruction was appropriate and, if so, whether CRIMJIG 7.07 accurately states the forfeiture rule, it is necessary to first examine the foundations of Minnesota's self-defense law. That examination must begin with the policy choices that have been made by the legislature. The legislature has enacted the broad parameters for the authorized use of force in self-defense. It has determined that the right to use "reasonable force" in self-defense is authorized if one is "resisting * * * an offense against the person." Minn.Stat. § 609.06, subd. 1(3) (2004). The ability to use deadly force in self-defense is authorized if it is necessary to resist or prevent "an offense which the actor reasonably

believes exposes the actor * * * to great bodily harm or death." Minn.Stat. § 609.065 (2004). Because Edwards and Oliver each used deadly force, section 609.065 is the controlling statute for this case.

Beyond these broad parameters, the legislature left the task of developing the details of the law on self-defense to the judiciary. *See* Minn.Stat. Ann. § 609.06 advisory comm. cmt.—1963 (West 2003). The legislature has not addressed the specific issue of forfeiture. Most jurisdictions recognize some form of the common-law rule that a defendant forfeits the right to claim self-defense where he or she created the necessity for acting in self-defense. *See generally* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.4(e) (2d ed. 2003) ("It is generally said that one who is the aggressor in an encounter with another—i.e., one who brings about the difficulty with the other—may not avail himself of the defense of self-defense."); 2 Charles E. Torcia, *Wharton's Criminal Law* § 137 (15th ed. 1994) ("A defendant, who provokes an encounter as a result of which he finds it necessary to use deadly force to defend himself, is guilty of an unlawful homicide and cannot claim that he acted in self-defense.") (footnote omitted). We have also recognized an initial aggressor forfeiture rule, at least in general terms. *See, e.g., State v. O'Neil,* 58 Minn. 478, 481, 59 N.W. 1101, 1101–02 (1894) ("[T]he evidence * * * was conspicuously insufficient to establish a legal justification for the killing on the ground of self-defense * * *. The defendant's testimony clearly discloses that he was the active aggressor * * *."), *overruled on other grounds by Hauwiller v. State,* 295 N.W.2d 641, 644 (Minn.1980). But we have not discussed that rule in detail or addressed the question of whether conduct by the defendant that is less

than the introduction of deadly force is sufficient for forfeiture.

Our first modern case to address the forfeiture rule defined it as "the absence of aggression or provocation on the part of the slayer." *State v. Johnson*, 277 Minn. 368, 373, 152 N.W.2d 529, 532 (1967). A few years later we approved a set of self-defense jury instructions, one of which defined an initial aggressor as one who "seeks or induces a quarrel which leads to the necessity in his own defense of using force against his adversary." *State v. Love*, 285 Minn. 444, 450, 173 N.W.2d 423, 426 (1970).

CRIMJIG 7.07 was apparently based on the instruction in *Love*, but it modifies the language to trigger forfeiture merely upon a finding that the defendant "began or induced the incident that led to the necessity of using force in the defendant's own defense." Although this court has reviewed other aspects of CRIMJIG 7.07, we have never scrutinized the words "began or induced the incident" to determine if they correctly describe what is necessary for forfeiture.

### B. *The Legal Accuracy of CRIMJIG 7.07*

After a careful examination of Minn. Stat. §§ 609.06 and 609.065, case law from other jurisdictions, and legal commentary on the forfeiture rule, I conclude that CRIMJIG 7.07 materially misstates the law in two respects.

The first flaw concerns the element of causation. CRIMJIG 7.07 creates a causal nexus between the defendant's conduct and an "incident," not between the defendant's conduct and the victim's use of deadly force. This is inconsistent with section 609.065, which does not authorize the victim to use deadly force in response to an "incident," but only in response to an "offense" by the defendant that the victim reasonably believes exposes the victim to "great bodily harm or death." This is also inconsistent with the notion recognized by a majority of jurisdictions that a defendant does not forfeit his right to self-defense by words alone.[2] A mere glare has also been held to be insufficient. *State v. Bristol*, 53 Wyo. 304, 84 P.2d 757, 766 (1938). Also, a defendant is generally not regarded as an initial aggressor merely because he armed himself or went to a place where an assault was likely.[3] The failure of CRIMJIG 7.07 to more narrowly define "incident" means that a jury could find that the "incident" was a conversation that the defendant began, which later escalated into the use of deadly force, even if the conversation did not legally cause the initiation of deadly force by the victim.

The second flaw in CRIMJIG 7.07 is that it does not require a finding that the defendant was in some way culpable in beginning the "incident." I agree with one commentator's observation that "[w]here an actor causes the conditions of his defense but does so blamelessly, there is

---

**2.** *See, e.g., People v. Mayes*, 262 Cal.App.2d 195, 68 Cal.Rptr. 476, 478 (1968); *People v. Manzanares*, 942 P.2d 1235, 1241 (Colo.Ct. App.1996); *State v. Davis*, 209 Iowa 524, 228 N.W. 37, 39 (1929); *State v. Ball*, 262 S.W. 1043, 1045 (Mo.1924); *People v. Gordon*, 223 A.D.2d 372, 636 N.Y.S.2d 317, 317 (1996); *McDonald v. State*, 764 P.2d 202, 205 (Okla. Crim.App.1988); *State v. Riley*, 137 Wash.2d 904, 976 P.2d 624, 628 (1999); *c.f. State v. Schroeder*, 199 Neb. 822, 261 N.W.2d 759, 761 (1978); *State v. Bogie*, 125 Vt. 414, 217

A.2d 51, 55 (1966); *Caudill v. Commonwealth*, 27 Va.App. 81, 497 S.E.2d 513, 515 (1998).

**3.** *State v. Gardner*, 96 Minn. 318, 328, 104 N.W. 971, 975 (1905); *see also Russell v. State*, 219 Ala. 567, 122 So. 683, 685 (1929); *State v. Jackson*, 94 Ariz. 117, 382 P.2d 229, 232–33 (1963); *Floyd v. State*, 1 Tenn.Crim. App. 106, 430 S.W.2d 888, 890 (1968).

little justification for taking away his defense. He is no more blameworthy for causing the conditions of his defense than is the actor who has made no causal contribution." Paul H. Robinson, *Causing the Conditions of One's Own Defense: A Study in the Limits of Theory in Criminal Law Doctrine*, 71 Va. L.Rev. 1, 8 (1985) [hereinafter Robinson, *Causing the Conditions* ]. Yet, the only culpability required by CRIMJIG 7.07 is the responsibility for having begun an incident.

Again, this is inconsistent with section 609.065, which does not authorize the victim to use force in response to lawful conduct by a defendant. Starting a conversation, even an angry one, would generally not be an "offense" that would cause the victim to reasonably believe that he was being exposed to great bodily harm or death, so as to justify the use of deadly force under section 609.065. According to LaFave, "[a] nondeadly aggressor (i.e., one who begins an encounter, using only his fists or some nondeadly weapon) who is met with deadly force in defense may justifiably defend himself against the deadly attack. This is so because the aggressor's victim, by using deadly force against nondeadly aggression, uses unlawful force." LaFave, *supra*, § 10.4(e). And, according to Robinson:

[I]n assault-defensive force situations, what would be considered culpability in

causing issues can be resolved through the normal operation of the rules governing the effect of privileged conduct: justified conduct may not be lawfully interfered with, or lawfully defended against, while unjustified conduct may be lawfully resisted.

2 Paul H. Robinson, *Criminal Law Defenses* § 123(b) (1984) [hereinafter Robinson, *Defenses*].

The word "incident" in CRIMJIG 7.07 is too vague to convey the elements of causation and culpability that are required by our self-defense statutes and the common law. As a result, CRIMJIG 7.07 misstates the law.

### C. The Correct Formulation of the Self–Defense Forfeiture Rule

Decisions of other jurisdictions generally reveal two formulations of the degree of fault and causation required to trigger the self-defense forfeiture rule. CRIMJIG 7.07 does not satisfy either of them.

#### 1. The Minority Rule

A minority of jurisdictions apply the self-defense forfeiture rule where there is "any conduct which is reasonably calculated to lead to an affray or deadly conflict and which provokes the difficulty." 40 C.J.S. *Homicide* § 188 (2006).[4] This ap-

---

**4.** New York's pattern jury instruction on the initial aggressor forfeiture rule provides an example of this approach:

The defendant would not be justified [in using deadly force] if he/she was the initial aggressor * * *. 'Initial aggressor' means the person who first attacks or threatens to attack; that is, the first person who uses or threatens the imminent use of offensive physical force.

Office of Court Admin. Comm. on Criminal Jury Instructions, *Criminal Jury Instructions, 2nd Edition* § 35.15 (2004), http://www.nyc-

ourts.gov/cji/1–General/Defenses/CJI2d.Justification.Person.pdf. Washington's is another example:

No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense * * * and thereupon [kill] [use, offer, or attempt to use force upon or toward] another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor and that defendant's acts and conduct provoked or commenced the fight, then self-defense * * * is not available as a defense.

proach is grounded in the desire to punish those who start fights by not allowing them to assert self-defense, even if a non-deadly struggle turns deadly. *See Langham v. State*, 12 Ala.App. 46, 68 So. 504, 506 (1915) ("He must be mindful of his acts or conduct which are likely to produce a deadly combat; and, if his acts or conduct show a willingness to enter into combat, or if his acts or words in any way invite it, in the eye of the law he has produced a necessity for slaying his adversary, and he cannot invoke the doctrine of self-defense. It is not enough that he is reasonably free from fault. He must be entirely free."). Under this approach, an aggressor may not defend himself against even unlawful deadly force if his conduct sufficiently provoked the violent response from the victim. *See Commonwealth v. Ashcraft*, 224 Ky. 203, 5 S.W.2d 1067, 1068–69 (1928) ("Our examination of other text authorities and acknowledged authors on criminal law has convinced us that the great weight of authority is to the effect that the provoking acts on the part of defendant, so as to deprive him of the right of self-defense, need not be such as would create the right of self-defense on the part of the deceased had he slain defendant because of the latter's provoking acts and conduct.").

The plurality opinion appears to accept this formulation of the self-defense forfeiture rule as the correct statement of Minnesota law but does not explain how CRIMJIG 7.07 accurately reflects it. The plurality says CRIMJIG 7.07 is legally accurate because "when read as a whole," the words "affray" and "contest," and an apparent contrast with "peace," indicate that an incident must be "a good deal greater than mere conversation." But these words appear in the revival portion of the instruction describing what a defendant must do to regain the right of self-defense after it has been forfeited. The need for the initial aggressor to revive his right to defend himself would necessarily involve an escalation of the incident by way of the victim's violent response. There would be no need to revive the right of self-defense otherwise. In other words, "affray" and "contest" are used to describe the situation after the victim has responded to the actor's innocent conduct that "began or induced the incident."

Even if the words contest, affray, and peace in the revival portion of the instruction could be reasonably interpreted to contemplate "a good deal greater than mere conversation," the plurality does not articulate what that "good deal more" is. This underscores the danger that the jury found that Edwards forfeited his right to defend himself based on a standard of conduct that falls short of what should be required for self-defense forfeiture, even under the minority rule.

Ultimately, I do not agree with the minority rule. The minority rule would solve part of the problem with CRIMJIG 7.07 because it inserts a causation element—the conduct of the defendant must have been reasonably likely to provoke the victim's response. But it does not solve the other part of the problem with CRIMJIG 7.07 because it does not require culpability of the defendant. This approach, therefore, does not fully satisfy the policy choices made by the legislature in section 609.065 when it authorized the use of deadly force against another in self-defense only when "resisting or preventing an offense which the actor reasonably believes exposes the actor * * * to great bodily harm or death."

11 Wash. Supreme Court Comm. on Jury Instructions, Washington Pattern Jury Instructions: Criminal § 16.04 (2d ed. 1994).

Section 609.065 suggests that the right to use force in self-defense survives if the victim's use of force is unlawful, even if the defendant may have "provoked" the victim. In other words, the statute implies a notion of proportionality—a victim acts unlawfully if he uses deadly force in response to conduct of the defendant which, while perhaps provoking, is not an offense that could be reasonably perceived to expose the victim to great bodily harm or death. *See* Robinson, *Defenses, supra,* § 123(c)(1) n. 5 (noting that because most jurisdictions recognize the revival of the right to act in self-defense where the defendant withdraws from his act of initial aggression—because the victim in continuing the affray violates the necessity requirement—there is no reason why "the defense should not similarly revive if the [victim's] response is unjustified because it violates the proportionality requirement").

### 2. *The Majority Rule*

The rule adopted by a majority of jurisdictions imposes forfeiture commensurate with the defendant's culpability in causing the need to act in self-defense. *See* La-Fave, *supra,* § 10.4(e) n. 62; *see generally* Robinson, *Causing the Conditions, supra,* at 17–20 (discussing the Model Penal Code's approach to forfeiture of the right to self-defense). Forfeiture is triggered only on a finding that the defendant, acting "with the purpose of causing [the victim's] death or serious bodily injury, provoked the use of force against himself in the same encounter."[5] Model Penal Code

§ 3.04(2)(b)(i) (1985); *see also* Haw.Rev. Stat. § 703–304(5)(a) (2005); N.J. Stat. Ann. § 2C:3–4b.(2)(a) (West 2005); 18 Pa. Cons.Stat. Ann. § 505(b)(2)(i) (West 2005). The goal is to hold the "initial aggressor * * * accountable for his original unlawful use of force but not for his defense against a disproportionate return of force by his victim." Model Penal Code § 3.04 cmt. 4(b).

Although the Model Penal Code's attempt to create a nexus between the defendant's culpability and the victim's use of deadly force is more consistent with section 609.065, there remains a slight inconsistency. By focusing only on the subjective intent of the defendant, the Model Penal Code ignores conduct of a defendant that might cause a reasonable perception of that intent by the victim. Section 609.065 specifically authorizes the victim to use deadly force where the victim "reasonably believes" that the defendant is exposing the victim to great bodily harm or death. Thus, a victim's use of force in response to his reasonable perception of the intent of the defendant may be lawful under section 609.065 and, in turn, the defendant is not authorized under section 609.065 to respond with deadly force if the victim's use of force is lawful. *See State v. Riley,* 137 Wash.2d 904, 976 P.2d 624, 629 (1999) ("[T]he initial aggressor doctrine is based upon the principle that the aggressor cannot claim self-defense because the victim of the aggressive act is entitled to respond with lawful force."); LaFave, *su-*

---

**5.** New Jersey's jury instruction on the initial aggressor forfeiture rule is an example of this approach:

Even if you find that the use of deadly force was reasonable, there are limitations on the use of deadly force. If you find that the defendant, *with the purpose of causing death or serious bodily harm to another person,*

provoked or incited the use of force against (himself/herself) in the same encounter, then the defense is not available to (him/her).

1 Model Criminal Jury Charge Comm., *NJ Model Jury Charges: Criminal* § 2C:3–4 (2003) (emphasis added), *available at* http://www.judiciary.state.nj.us/charges/jury/justif001.htm. It is substantively identical to

*pra*, § 10.4(e) ("[T]he aggressor's victim, defending himself against the aggressor, is using lawful, not unlawful, force; and the force defended against must be unlawful force * * *.") (footnote omitted). The Model Penal Code's approach would allow the use of deadly force in self-defense even if the victim's application of force was lawful, so long as the defendant did not intend to cause death or serious harm.

Thus, for example, a defendant who points a loaded gun at someone and demands money may only have the intent of taking money, not of causing death or serious bodily harm to that person. The victim may reasonably believe that the defendant's conduct "exposes * * * [him] to great bodily harm or death," which would legally justify the victim to respond with deadly force against the defendant under section 609.065. Yet, the Model Penal Code would permit the defendant to assert self-defense against the victim's lawful use

of force because the victim's reasonable perception was not consistent with the defendant's subjective intent. This would violate section 609.065.[6]

To incorporate the policy choices of section 609.065 within the approach taken by the Model Penal Code, I would conclude that the right of self-defense is forfeited where the victim's use of deadly force was legally justified, that is, where the victim's application of deadly force was "necessary in resisting or preventing an offense which the [victim] reasonably believe[d] expose[d] the [victim] * * * to great bodily harm or death." Minn.Stat. § 609.065.

This formulation of the self-defense forfeiture rule recognizes both of the requisite elements of causation and culpability. It is consistent with each of our prior decisions that determined that the defendant was the initial aggressor and had forfeited his right to self-defense.[7] And it

---

the Model Penal Code's formulation. *See* Model Penal Code § 3.04(2)(b)(i).

**6.** Adopting the Model Penal Code's approach would also create tension with several of our prior cases where we classified the defendant as an initial aggressor for conduct that would not satisfy the Model Penal Code's standard. *See State v. Thompson*, 544 N.W.2d 8, 12 (Minn.1996) (holding that the defendant was the initial aggressor when he pointed a firearm at the victim's head even though the only evidence of defendant's intent suggested that defendant intended only to prevent the victim from drawing a gun on him); *State v. Boitnott*, 443 N.W.2d 527, 532 (Minn.1989) (holding that the defendant was the initial aggressor when he trespassed in the victim's home and threatened him with a handgun despite evidence indicating that his intent was only to regain possession of his property); *Bellcourt v. State*, 390 N.W.2d 269, 272–73 (Minn.1986) (stating the assumption that defendant was the initial aggressor because he was robbing a liquor store and holding employees at gunpoint even though his intent was only to get money).

**7.** Each of the following cases involved conduct by the defendant that would have legally

justified the victim to use deadly force in response. *State v. Richardson*, 670 N.W.2d 267, 278 (Minn.2003) (holding that the defendant was the initial aggressor when he broke into his estranged wife's home with a rifle and shot her ex-husband); *State v. Thompson*, 544 N.W.2d at 12 (Minn.1996) (holding that the defendant was the initial aggressor when he pointed a firearm at the victim's head during a drug deal); *State v. Gray*, 456 N.W.2d 251, 258 (Minn.1990) ("Evidence indicating defendant was the aggressor includes a statement from Tyson, apparently the only witness to the beginning of the confrontation, that defendant pulled a gun first and attempted to rob Gales and himself."); *State v. Boitnott*, 443 N.W.2d at 532 (holding that the defendant was the initial aggressor where he trespassed in the victim's home and threatened him with a handgun); *State v. Robinson*, 427 N.W.2d 217, 228 (Minn.1988) (implying that the defendant was the initial aggressor when he held the victim at knifepoint while his accomplices robbed and beat the victim); *Bellcourt v. State*, 390 N.W.2d at 273 (stating the assumption that the defendant was the initial aggressor because he was robbing a liquor store and holding employees at gunpoint); *State v. Columbus*, 258 N.W.2d 122,

·

provides the advantage of uniformity of application. It focuses on the legal justification of the victim's response to the defendant's initial conduct, a determination jurors are already asked to make under this state's general law on self-defense.[8] A forfeiture rule that restricts jurors to a concept of "provocation" would be more likely to lead to varying results depending on jurors' individual values.

Because CRIMJIG 7.07 misstates the law on self-defense forfeiture, I conclude that use of CRIMJIG 7.07 was error.

## II.

Because CRIMJIG 7.07 materially misstates the law, I would hold that the district court erred in giving that instruction. The question then is whether that error was harmless. *See State v. Kuhnau,* 622 N.W.2d 552, 558–59 (Minn.2001). A jury instruction that materially misstates the law is harmless if it can be said beyond a reasonable doubt that the error had no significant impact on the verdict. *State v. Olson,* 482 N.W.2d 212, 216 (Minn.1992).

In order for the use of CRIMJIG 7.07 to have been harmless, one would have to conclude that the jury, if correctly instructed on the self-defense forfeiture rule, would necessarily have found that Edwards was the initial aggressor. Stated another way, if there is evidence in the record on which the jury could have found

that Edwards' conduct did not authorize Oliver to respond with deadly force, and that Edwards' use of deadly force was only in response to that of Oliver, then the error would not be harmless.

To determine whether the use of CRIMJIG 7.07 was harmless, we view the evidence in the light most favorable to Edwards. *See Olson,* 482 N.W.2d at 216 (noting that although the jury "probably" would have found the defendant guilty despite the erroneous jury instruction because there was substantial circumstantial evidence of his guilt, the evidence supporting his innocence created a reasonable doubt that the error did have a significant impact on the verdict). Because there is evidence in the record from which the jury could have found that Edwards did not use or threaten to use deadly force until after Oliver had first done so, I cannot conclude that the evidence compelled a finding that Edwards forfeited his right to self-defense.

We have no way of determining whether the jury accepted or rejected Edwards' version of the facts. It is conceivable that the jury could have accepted Edwards' version but still have concluded that Edwards forfeited his right of self-defense merely because he began the conversation with Oliver. If I accept Edwards' version of the facts, I necessarily conclude that Edwards' conduct before any guns were

---

125 (Minn.1977) ("The defendant became the aggressor by drawing, loading, and aiming the rifle at Lester Dow."); *see also State v. Graham,* 292 Minn. 308, 309–11, 195 N.W.2d 442, 443–44 (1972) (noting that the defendant admitted he was the initial aggressor when he intentionally fired several shots from a shotgun in the direction of a group of people).

8. This approach would also simplify the withdrawal rule that permits the revival of the aggressor's right of self-defense. Instead of the jury having to determine whether the defendant "[1] declined to carry on the affray

and * * * honestly tried to escape from it, and [2] * * * clearly and fairly * * * informed the adversary of a desire for peace and of abandonment of the contest," *see* CRIMJIG 7.07, this formulation gives the jury self-defense concepts that have already been the subject of significant judicial development. Implicit in this formulation is the ability for an initial aggressor to revive his right of self-defense by eliminating the opportunity for the victim to act in self-defense. Any subsequent force by the victim would thus be unlawful and the aggressor would be permitted to defend himself.

fired was not sufficient to forfeit his right of self-defense.

As noted, Edwards testified that he only wanted to talk to Oliver about some rumors and felt the situation could be resolved without resort to violence. Edwards denied "mean mugging" Oliver and testified that he parked his car and waited for Oliver at Oliver's direction, as opposed to following Oliver. Instead, he said he asked Oliver, in a normal voice, to talk, and Oliver agreed. Edwards denied saying to Oliver in an angry voice "why you telling people I'm airing you out, Oliver?" Edwards testified that his perception that this issue could be resolved by a conversation was reinforced by Oliver's statement that he was going to put his gun away in a nearby car. Finally, Edwards testified that he only shot at Oliver after Oliver shot at him first, and that Edward had no ability to retreat.

Edwards' testimony was corroborated to some degree by the testimony of other witnesses. As noted, Moore testified that Edwards spoke to Oliver in a normal voice. Moore and Joshua agreed that Edwards did not say anything about "spraying" anyone. Moore and Jones testified that Oliver opened the hood of a nearby car and when he returned to Edwards' van, his gun was not visible. Also, Oliver did in fact have a gun and clearly fired shots.

If the jury believed this version of the facts, it could have found that Oliver was not legally justified in shooting at Edwards and that Edwards was legally justified in shooting at Oliver in self-defense. In this connection, it is noteworthy that the jury found Edwards not guilty of first-degree murder with premeditation. This indicates that the jury believed this was a spontaneous event and suggests that the jury may not have fully agreed with the state's view of the evidence. The state's direct evidence that Edwards fired the first shot was not overwhelming because it was provided by three witnesses who were either friends with Oliver, were under the influence of drugs or alcohol, or were in poor positions to clearly see the events.

The state argues that there was sufficient evidence for the jury to find Edwards was the initial aggressor and forfeited the right to self-defense based on the testimony that Edwards (1) gave Oliver a mean glance, (2) spoke to him in an angry voice, (3) followed him, and (4) said something to him about "spraying the motherf———." But, for the reasons discussed above, these facts fall short of the use or threat to use deadly force and are not sufficient to support giving a jury instruction on forfeiture. The majority cites to additional facts that Edwards had a handgun already on his lap ready to be fired, that he put on his gloves, and that the van owner expressed concern on seeing these actions. Although this evidence was relevant to premeditation, it was not relevant to whether Edwards caused Oliver to use deadly force because there is no evidence that Oliver or anyone outside of the van was aware of these facts.

The majority suggests that Edwards did not satisfy his duty to retreat, based on these facts: "Edwards was in the driver's seat of the van that was stopped in the middle of the street, the engine was running, nothing was blocking his exit, and Oliver was on foot outside." This recitation of the facts ignores Edwards' testimony that he had no ability to drive off when Oliver was at the car window and that, before he fired his gun, Oliver shot first and that Edwards knew this because he "heard the flash" of Oliver's gun as it fired. This testimony presents a jury issue on whether Edwards had any opportunity to retreat after Oliver initiated the use of deadly force. Instead, the majority usurps the role of the jury by engaging in fact

finding and making a credibility determination that Edwards' testimony should be disregarded.

Moreover, the undisputed evidence is that when Edwards did attempt to retreat after firing his gun, the icy roads meant that it took several seconds for the van to move, during which time Oliver was able to fire several shots into the van, hitting Wilson in the leg. In other words, the pivotal fact issue is who fired his gun first, and if, as Edwards testified, it was Oliver, then the jury could surely conclude that Edwards did not have a realistic opportunity to retreat.

Finally, the majority argues that the jury's verdict of acquittal for premeditated murder indicates that the jury found Edwards did not act as a reasonable person in using deadly force. I disagree. Some of the facts the state relied on as establishing premeditation were also the same facts it relied on to establish forfeiture. The jury's rejection of premeditation is an indication that the jury believed Edwards' version of the facts: that he did not approach Oliver looking for a fight, that he did not yell at, swear at, or mean mug Oliver, and that he only formed an intent to kill Oliver when Oliver drew his gun and fired at Edwards. If Edwards did not premeditate this shooting, would he have decided to shoot Oliver at all if Oliver had not first drawn and fired his gun? My concern is that the jury actually concluded that Edwards was acting in self-defense, but that he forfeited his right to do so when he began the conversation with Oliver.

Accordingly, I would hold that the use of CRIMJIG 7.07 to instruct on self-defense forfeiture was prejudicial error, necessitating a new trial.

PAGE, Justice (dissenting).

I join in the dissent of Justice Hanson.

MEYER, Justice (dissenting).

I join in the dissent of Justice Hanson.